Robert Simpson RICCI, et al., Plaintiffs,

v.

James J. CALLAHAN, et al., Defendants.

MASSACHUSETTS ASSOCIATION FOR RETARDED CITIZENS, INC., et al., Plaintiffs,

v.

Michael S. DUKAKIS, et al., Defendants.

Thomas MC EVOY, Jr., et al., Plaintiffs,

v.

Manuel CARBALLO, et al., Defendants.

William GAUTHIER, et al., Plaintiffs,

v.

Manuel CARBALLO, et al., Defendants.

MASSACHUSETTS ASSOCIATION FOR RETARDED CITIZENS, INC., et al., Plaintiffs,

v.

Michael S. DUKAKIS, et al., Defendants.

Nos. CA 72–469–T (Belchertown), CA 75–5210–T (Dever), CA 74–2768–T (Fernald), CA 75–3910–T (Monson) and CA 75–5023–T (Wrentham).

United States District Court, D. Massachusetts.

May 18, 1983.

Beryl W. Cohen, Nonnie S. Burnes, Hill & Barlow, Boston, Mass., for plaintiffs.

Carl Valvo, Joan Stoddard, Leah Crothers, Alan B. Sherr, Carolyn Wood, Asst. Attys. Gen., David M. Thomas, Associate Counsel, Exec. Office of Admin. & Finance, Robert P. Garrity, Sp. Asst. Atty. Gen., Stuart Lesser, Bureau of Bldg. Const., George P. Napolitano, Acting Gen. Counsel, Dept. of Mental Health, Boston, Mass., for defendants.

Kim E. Murdock, Sp. Asst. Atty. Gen., Legal Coordinator, Boston, Mass.

TAURO, District Judge.

These consolidated cases concern five Massachusetts institutions for the retarded whose operation is presently guided by the terms of consent decrees which were negotiated by the parties, and later entered as orders of this court on July 25, 1977. Basically these consent decrees require the Commonwealth to operate and maintain these institutions in a manner consistent with the standards imposed by Title XIX of the Social Security Act, 42 U.S.C. § 1396 et seq.

Independent of any consent decree requirements, the Commonwealth must operate the subject institutions in compliance with Title XIX standards in order to be eligible for federal matching funds. The

United States Department of Health and Human Services (HHS) has the obligation to monitor these institutions to determine if they are in compliance with Title XIX standards. Although the issue of Title XIX compliance is central to the Commonwealth's obligation under the consent decrees, HHS is not now a party to this litigation. The confluence of interest between this court and HHS in determining whether or not the Commonwealth is in fact meeting Title XIX standards raises the immediate issue as to whether or not the Secretary of HHS should now be added as a party.

## I

The relationship of HHS to these consent decrees can be better understood by reviewing briefly the history of the underlying litigation.[1] In 1972, a class action was filed on behalf of the mentally retarded clients residing at Belchertown, alleging that conditions there were so inadequate that they violated certain of the residents' constitutional and statutory rights. During the next three years, comparable suits were instituted on behalf of residents at Fernald, Monson, Wrentham and Dever.[2] Those Commonwealth officials sharing responsibility for the operation of these institutions were named as defendants.[3]

The court conducted a series of extensive inspection tours involving each institution. Responsible state and federal officials, as well as legislative leaders, accompanied the court on one or more views. Following these inspections, this court publicly termed the institutions to be little more than "pig pens" and "human warehouses."[4] It was clear to the court that conditions at the various institutions were intolerable. That assessment was never challenged by any state or federal official. Indeed, rather than attempting to defend the indefensible, Governor Dukakis and Attorney General Bellotti led the defendants in the enlightened mission of working with the plaintiffs and this court to fashion necessary remedial programs for each institution.

The parties dedicated hundreds of hours to the task of assessing client needs at each institution, as well as the appropriate means for meeting those needs. These efforts culminated in the crafting of five interim consent decrees which embodied the parties' collective assessment of what needed to be done at each institution in order to enable the retarded residents "to survive their misfortune under conditions that at least minimally demonstrate the Commonwealth's regard for their human dignity."[5]

These consent decrees were not the whim of a federal court, nor did they represent an activist federal intrusion in the affairs and prerogatives of state officials. Their terms were not imposed by the federal court. To the contrary, the need for each capital renovation was studied and agreed upon by the parties—building by building, room by room. Similarly, necessary staffing increases were determined on a position by position basis.

The parties agreed to the terms of these decrees, mindful of the Commonwealth's limited financial resources and the importance of justifying every tax dollar that would be devoted to implementing this ambitious but essential remedial undertaking. Indeed, the touchstone relied upon by the parties were the Title XIX standards which the Commonwealth was already obliged to

1. For a more complete discussion of the history and issues involved in this case, see *Ricci v. Okin,* 537 F.Supp. 817 (D.Mass.1982).

2. The complaints alleged violations under various federal and Massachusetts statutes, including Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.,* and Mass.Gen.Laws ch. 19 and ch. 123. Although not cited in the complaints, Part 1, Article X of the Massachusetts Constitution also provides that "[e]ach individual of the society has the right to be protected by it in the enjoyment of his life, liberty, and property, according to standing laws."

3. In addition to the superintendents at each of the institutions, the defendants include the Governor, the Secretary of Human Services and the Commissioner of Mental Health.

4. Transcript of July 25, 1977 hearing at p. 8.

5. *Ricci v. Okin, supra* at 836.

meet in order to ensure the continuing annual flow of millions of dollars in federal matching funds.

The decrees were signed by various state officials, including Governor Dukakis and Attorney General Bellotti, at a hearing on July 25, 1977.[6] Also in attendance was Speaker McGee of the Massachusetts House of Representatives. His remarks on that day captured the tone of the occasion.

I just really want to say that in my 15 years in the legislature, a commitment has always been there by the members of the legislature. If one just goes to any one of these institutions and looks at the children there, then I just think—as I just said to you—"If we can't take care of them, then we had better fold up our tents and go home."

And we are not ready to do that. We are commited to the job that you want done; the people involved want done, and we'll do it.[7]

Similar in spirit were the words of Attorney General Bellotti.

I made a policy decision with the Governor during the pendency of these cases to, shall we say, ameliorate the adversary system because we made a judgment that the level of care did not reach [a] constitutional level of care . . . .

We cannot tell people what kind of care there should be, but we can say that a constitutional level of care has not been attained and that the case would be indefensible. We made that judgment. I merely made a policy decision. They [the parents of the retarded] did all the work with people from the State agencies, the Speaker, President of the Senate.

\* \* \* \* \* \*

I think it is probably the classic example of where the good of the people overrides the adversary system: the cooperative effort among the Legislature, the Executive Branch, and the Judicial Branches of Government—and they were talking so much about separation of powers because I think of your [the court's] ability more than anything else to reach that fine line where there is still a separation, yet a cooperation—that we are able to have accomplished all these things.[8]

The Dukakis administration's firm commitment to the full implementation of those decrees was reflected in these comments by the Governor to the court:

And I can only say again to you that we will do everything we can to make sure that these decrees and agreements are implemented. And I am sure you will and I know you will make sure that we are doing that every step of the way, but I don't really think that will be necessary because we are going to get out there and do the job and achieve the goals and the purposes that we were all talking about so endlessly a decade ago and we have finally arrived at this afternoon. And I want to thank you so much for your major role in all of this.[9]

Through follow-up inspection tours during the intervening years, this court knows first hand that great progress has been made at each of these institutions. Although this progress has been too often achieved at a painfully slow pace, the decrees have received the actual and articulated support of leaders in both the executive and legislative branches of state govern-

---

**6.** Although the consent decrees signed on July 25, 1977 contained provisions relating to personnel, a final decree outlining the personnel requirements for the five state institutions was not approved by this court until August 2, 1978. During the intervening year the parties conducted prolonged negotiations and attended innumerable meetings in an effort to arrive at a constitutionally and statutorily acceptable level of staffing. The final version of the decree was the culmination of a thorough, complex, and cooperative process which included input from the superintendents of the various institutions, as well as guidance of professionals from the Massachusetts Departments of Mental Health and Public Health.

**7.** Transcript of July 25, 1977 hearing at p. 16.

**8.** *Id.* at pp. 17–18.

**9.** *Id.* at p. 15.

ment.[10] Those legislators who have not yet taken the opportunity to see for themselves the fruits of their authorized expenditures should do so. They have much to be proud of.

Despite this progress, however, these institutions still do not meet Title XIX standards and, therefore, do not meet the agreed upon provisions of these consent decrees. This problem is compounded by the fact that the legislature has yet to appropriate the funds necessary to bring these institutions into compliance. As a consequence, the continuing award of matching federal funds by HHS has been seriously jeopardized. These acute problems require the court to focus its attention on the question of whether HHS should now be added as a party to this litigation.

## II

As has been pointed out, these consent decrees are in large part keyed to the provisions of Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 et seq. Under Title XIX, HHS is entrusted with the task of monitoring compliance with Title XIX standards. Due to the utilization of Title XIX standards in the consent decrees, this court's determination of consent decree compliance will necessarily have a great impact on HHS's Title XIX compliance review. Similarly, any HHS compliance assessment will have an impact on consent decree implementation.

Because of this interrelationship, and particularly in light of the recent negotiations between the state and HHS regarding Title XIX compliance, it has become clear to the court that HHS's formal participation in these cases is necessary for continued just adjudication. HHS's interest in these cases is obvious. Moreover, the absence of HHS

from these cases raises the risk of subjecting the parties to inconsistent obligations. Under the circumstances, the court determines that HHS is a necessary party to these cases.

Rule 19 of the Fed.R.Civ.P. provides for compulsory joinder of necessary parties, if the party to be joined is subject to service of process, and joinder will not deprive the court of subject matter jurisdiction. These conditions are met here. Further, Rule 19 provides that if a necessary party has not been joined, "the court shall order that he be made a party."

The court hereby orders that the Secretary of HHS be made a party to these cases. The clerk of the court shall serve on an authorized agent of the Secretary of HHS copies of the complaints and consent decrees in each of these five cases, as well as a copy of this memorandum and accompanying order. The Secretary of HHS shall henceforth be a party, and shall be served with any papers filed by any other party.

> In another context, this court stated: The retarded have no potent political constituency. They must rely on the good will of those of us more fortunate than they, and the Constitution which controls the manner in which all of us must meet our varied responsibilities.[11]

It is clear that HHS and the Commonwealth have independent yet coordinate responsibilities with respect to the manner in which these five institutions are operated and maintained. This joinder will, therefore, serve to channel properly the combined energies of the federal and state executive branches of government to the task of meeting their shared responsibilities for ensuring that our retarded citizens receive proper care.

An order will issue.

---

**10.** For example, at a September 1980 open court hearing concerning the status of the decrees, Senate Ways and Means Committee Chairman Atkins stated that "the legislature has always, without exception and without delay, responded to all claims made by this court for finances to put the state into compliance with the consent decrees." Transcript of the September 5, 1980 hearing at pp. 38–9. Senator Atkins' counterpart in the House of Repre-

sentatives, Ways and Means Committee Chairman Finnegan, was even more positive in his statement of support, declaring that "none of the intent of the consent decrees have ever been deviated from and they're not going to be." Id. at p. 51. Mr. Finnegan is now State Auditor.

**11.** Ricci v. Okin, supra at 836.