Robert Simpson RICCI, et al., Plaintiffs,

v.

James J. CALLAHAN, et al.,
Defendants.

MASSACHUSETTS ASSOCIATION FOR
RETARDED CITIZENS, INC., et
al., Plaintiffs,

v.

Michael S. DUKAKIS, et al.,
Defendants.

Thomas MC EVOY, Jr., et
al., Plaintiffs,

v.

Manuel CARBALLO, et al., Defendants.

William GAUTHIER, et al., Plaintiffs,

v.

Manuel CARBALLO, et al., Defendants.

MASSACHUSETTS ASSOCIATION FOR
RETARDED CITIZENS, INC., et
al., Plaintiffs,

v.

Michael S. DUKAKIS, et al.,
Defendants.

Civ. A. Nos. 72–469–T (Belchertown), 75–5210–T (Dever), 74–2768–T (Fernald), 75–3910–T (Monson) and 75–5023–T (Wrentham).

United States District Court,
D. Massachusetts.

Dec. 12, 1983.

Beryl W. Cohen, Nonnie S. Burnes, Hill & Barlow, Boston, Mass., for plaintiffs.

Carl Valvo, Asst. Atty. Gen., Joan Stoddard, Leah Crothers, Alan B. Sherr, Carolyn Wood, Asst. Attys. Gen., Joe Feaster, Associate Counsel, Executive Office of Admin. & Finance, Robert P. Garrity, Sp. Asst. Atty. Gen., Stuart Lesser, Richard Ames, Acting Gen. Counsel, James J. Callahan, Jr., M.D., Com'r, Mass. Dept. of Mental Health, Manuel Carballo, Secretary of Health and Human Services, Frank T. Keefe, Secretary of Admin. and Finance, Kim E. Murdock, Sp. Asst. Atty. Gen., Legal Coordinator, Robert J. Harper, Administrative Coordinator, Executive Office of Human Services, Clifford Pierce, Regional Counsel, Health Standard Quality Bureau, Dept. of Health & Human Services, Boston, Mass., for defendants.

## MEMORANDUM

TAURO, District Judge.

On September 7, 1983, this court ordered Secretary of Human Services Margaret Heckler[1] to conduct an on-site study and evaluation of each institution involved in these consolidated cases.[2] The Secretary's mandate was to advise this court whether current conditions at the institutions met standards imposed by Title XIX,[3] and agreed to by the parties in consent decrees approved by this court on July 25, 1977.

On October 31, 1983, the Secretary filed a report discussing conditions at each institution, as well as her conclusions with respect to Title XIX and consent decree compliance. All other parties have now filed responses to the Secretary's report.[4]

Secretary Heckler's report is comprehensive, thorough and professional. In summarizing its essence she stated that

The facts are alarming ... at every single institution there were substantive gaps between the promise of improvement and the reality of compliance with existing safety standards which are necessary to protect the residents ... some of the buildings are so far below minimally acceptable standards that I must now confront the issue of decertification.[5]

Underscoring "the urgency of the institutions' needs and the necessity of a response to the problem" by the Massachusetts legislature, Secretary Heckler went on to state:

The issue has been recognized and has festered without resolution for too long. For over a decade, the Commonwealth has been on notice that thousands of children, women and men in these five Massachusetts institutions were being shortchanged. I serve as both their guardian and their advocate. I cannot and will not ignore their needs.[6]

Secretary Heckler concluded her remarks by targeting accurately those whose responsibility it is to remedy the substandard conditions that have plagued these institutions for years.

The time for patience by the federal government—postponement and procrastination by the Commonwealth of Massachusetts—is past. I again urge the Massachusetts House and Senate to make the mentally handicapped ... an immediate priority by promptly adopting a capital outlay budget which provides the funds to correct these long standing inequities.[7]

This court stayed any action on Secretary Heckler's reports in order to give Governor Dukakis and the legislature an opportunity to formulate and implement a meaningful and effective remedial program. For his part, the Governor acted responsibly by requesting an 80 million dollar capital budget to meet the deficiencies detailed in Secretary Heckler's report. Speaker McGee and the House of Representatives acted with similar responsibility by approving the Governor's budget request, essentially as submitted.

That pattern of responsible action was shattered on December 7, 1983 by the Senate Ways and Means Committee which cut the Governor's request by approximately twenty-five percent. The rationale offered by Senate Ways and Means Chairman Atkins for the budget cut was reported as being

---

1. By order of this court, the Secretary was made party to this litigation on May 18, 1983. *See Ricci v. Callahan,* 97 F.R.D. 737 (D.Mass.1983).

2. This litigation is now in its second decade. Its procedural history is summarized in prior opinions. *See Ricci v. Callahan,* 97 F.R.D. 737; *Ricci v. Okin,* 537 F.Supp. 817 (D.Mass.1982).

3. 42 U.S.C. § 1396 *et seq.* (1974).

4. The Secretary's report and the various responses are hereby admitted as exhibits. They are identified in Appendix 1, attached to this memorandum.

5. Statement by Secretary Heckler October 31, 1983—Appendix 2.

6. *Id.*

7. *Id.*

If we build the beds ... to satisfy the court, there will be nobody to occupy those beds.[8]

However credible Senator Atkins' remarks may sound to the uninitiated, they are readily recognized by those familiar with the history of this litigation as being merely another example of the "postponement and procrastination" that was so aptly recognized and criticized by Secretary Heckler.

Senator Atkins is apparently misinformed when he suggests that the Governor's budget request was merely an effort "to satisfy the court." After all these years, Senator Atkins should know that the renovations called for in the Governor's budget request are not the whim of the federal court. To the contrary, the Governor's budget request was for renovations that are required by Title XIX standards, if the Commonwealth is to continue to be eligible for the millions of dollars it receives annually in federal matching funds.

The consent decrees entered by this court six years ago were negotiated and drafted by the parties themselves after inspection tours of these institutions established that they were little more than "pig pens" and "human warehouses."[9] Governor Dukakis and Attorney General Bellotti, to their great credit, refused to defend the indefensible. Rather, they undertook the enlightened mission of working with the plaintiffs and this court to fashion necessary remedial programs for each institution.

Hundreds of hours were dedicated to the task. The need for capital renovation was studied and agreed upon by the parties— building by building, room by room. Staffing increases were carefully analyzed on a position by position basis. Essentially, the standards relied upon by the parties, and then memorialized by the consent decrees, were those of Title XIX—standards that the Commonwealth was already obligated

to meet in order to insure the continuing annual flow of federal matching dollars.

Moreover, the decrees were crafted with great flexibility. They permitted the Commonwealth to avoid any renovation made unnecessary by placement of residents in community programs. Construction planning deadlines were set with more than sufficient lead time to allow cancellation, should community placement become a reality rather than a promise. At almost every status conference held by this court during the past six years, plans for community placement were represented by Department of Mental Health (DMH) officials as being well on the way to implementation. This court encouraged those plans and stated repeatedly that it had no preference as to where the retarded were cared for—community or institution. The court's only concern was that the care be proper and adequate to meet the human rights of affected retarded citizens.

It is a matter of record that this court has granted dozens of extensions to the Commonwealth's renovation schedule in order to give DMH officials an opportunity to get a comprehensive community program from the planning table to the field.[10] Nevertheless, time after time, extended target dates for community placement were simply not met, thereby triggering the renovation schedules at the various institutions.

And so, any claim that renovations at the various institutions are being made at the expense of community placement is pure fiction. The basic reason why there is no comprehensive program for those who would benefit from community placement is that the legislature has seen fit not to fund such an effort. Any claim that funding of community placement would have required a duplicative expenditure of public funds is made by those who either have not read or do not understand Title XIX standards and the applicable terms of the consent decrees. The fact is that there should have been both community and institutional

8. Boston Globe, December 8, 1983, p. 44.

9. Transcript of July 25, 1977 hearing at p. 8.

10. This court's docket is a matter of public record and is available for inspection.

programs for the retarded. Title XIX and the consent decrees permit such an approach.

Of course, improperly fostering hostility and competition between advocates of community and institutional care can be an effective, though transparent, diversionary tactic for those who really wish to do as little as possible for the retarded.

The legislature has now recessed for a Christmas holiday without providing any funds to rectify the deficiencies that Secretary Heckler termed "alarming." It is manifestly unfair to defer the constitutional rights of those who must live at these institutions until public officials charged with responsibility for their care decide to abandon an apparent policy of "postponement and procrastination." [11] Certainly, it would be unconscionable for this court to permit such a policy of postponement and procrastination to be further subsidized by federal tax dollars.

This court has stated in the past

The retarded have no potent political constituency. They must rely on the good will of those of us more fortunate than they, and the Constitution which controls the manner in which all of us must meet our varied responsibilities.[12]

It is now clear that Secretary Heckler must be permitted to meet her Constitutional responsibilities to the retarded and "to serve as both their guardian and their advocate." [13] To this end, the court lifts any and all stays entered in these cases, grants the Secretary's Motion for a Protective Order, and authorizes her to confront the issues of decertification and the appropriate withholding of federal matching funds.

APPENDIX 1

| EXHIBIT A | 9/15/83 | Belchertown Plaintiffs' Response to the Court Order of September 7, 1983, Relative to Noncompliance of Buildings E, F, G and Infirmary with Title XIX and the Consent Decree. |
| EXHIBIT B | 9/21/83 | Defendants' Statement of Position Concerning Buildings E, F, G and Infirmary at Belchertown State School. |
| EXHIBIT C | 10/05/83 | Plaintiffs' Responses to the Defendants' (9/21/83) Statement of Position Concerning Buildings E, F, G and Infirmary at the Belchertown State School. |
| EXHIBIT D | 10/31/83 | Fernald and Monson Plaintiffs' Responses to the Court Order of September 7, 1983. |
| EXHIBIT E | 10/31/83 | Dever and Wrentham Plaintiffs' Statement of Position Concerning Compliance with the Consent Decrees and Title XIX. |
| EXHIBIT F | 10/31/83 | Defendants' Statements of Position Concerning Fernald State School and Monson Developmental Center. |
| EXHIBIT G | 10/31/83 | Secretary of the Department of Health and Human Services Statement of Position (concerning the compliance of 5 Massachusetts Intermediate Care Facilities for the Mentally Retarded with Title XIX standards and the consent decrees). |
| EXHIBIT H | 11/01/83 | Defendants' Statement of Position Concerning Certain Buildings at Wrentham and Dever State Schools. |
| EXHIBIT I | 11/14/83 | Response of the Secretary of Health and Human Services to Defendants' Statement of Position at the State Schools. |

11. Secretary Heckler's statement, Appendix 2.

12. *Ricci v. Okin,* 537 F.Supp. at 836.

13. Statement of Secretary Heckler October 31, 1983.

EXHIBIT J    11/21/83    Defendants' Response to the Statement of Position of the Secretary of the Department of Health and Human Services.

EXHIBIT K    11/21/83    Defendants' Response to Monson Plaintiffs' Statement of Position.

EXHIBIT L    11/21/83    Defendants' Response to the Dever and Wrentham Plaintiffs' Statement of Position Concerning Compliance with the Consent Decrees and Title XIX.

EXHIBIT M    11/21/83    Defendants' Response to the Fernald Plaintiffs' Statement of Position.

## APPENDIX 2

**U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES
BOSTON REGIONAL OFFICE**

For additional information,
Contact: Roger Woodworth
(202) 245-3400

FOR IMMEDIATE RELEASE             OCTOBER 31, 1983

WASHINGTON, D.C.—Secretary Margaret M. Heckler has, late today, filed with the Federal District Court of Massachusetts (Judge Joseph Tauro) the results of the intensive, on-site survey and investigation which the federal Health Care Financing Administration's (HCFA) health, mental retardation and fire safety experts have completed at the five Massachusetts State Schools for the Mentally Retarded (Belchertown, Dever, Fernald, Monson and Wrentham). For over a decade, these institutions have been under federal court orders to come into conformity with federal and state standards.

"The facts are alarming," said Secretary Heckler. "Our survey found that in certain buildings at every single institution there were substantive gaps between the promise of improvement and the reality of compliance with existing safety standards which are necessary to protect the residents."

"Some of the shortcomings can be remedied in a matter of months with funds already appropriated by the Legislature. The money that Massachusetts has previously put into the pipeline will bring about conformity in those cases. But some of the buildings are so far below minimally acceptable standards that I must now confront the issue of decertification."

"When I visited the Fernald school in Waltham in July, I stated as simply as possible the urgency of the institutions' needs and the necessity of a response to the problem by the members of the Massachusetts General Court. The issue has been recognized and has festered without resolution for too long. For over a decade, the Commonwealth has been on notice that thousands of children, women and men in these five Massachusetts institutions were being shortchanged. I serve as both their guardian and their advocate. I cannot and will not ignore their needs. The time for

patience by the federal government—postponement and procrastination by the Commonwealth of Massachusetts—is past."

"I again urge the Massachusetts House and Senate to make the mentally handicapped residents of Belchertown, Dever, Fernald, Monson and Wrentham State schools an immediate priority by promptly adopting a capital outlay budget which provides the funds to correct these long-standing inequities." Mrs. Heckler concluded.