**Robert Simpson RICCI, et al., Plaintiffs,**

**v.**

**James J. CALLAHAN, Jr., et al., Defendants,**

**and consolidated cases.**

Civ. A. Nos. 72–0469–T (Belchertown); 74–2768–T (Fernald); 75–3910–T (Monson); 75–5023–T (Wrentham); 75–5210–T (Dever).

United States District Court, D. Massachusetts.

Oct. 9, 1986.

---

Beryl W. Cohen, Nonnie S. Burnes, Bruce E. Falby, Hill & Barlow, Boston, Mass., for plaintiffs.

Carl Valvo, Kim Murdock, Asst. Attys. Gen., William F. Weld, U.S. Atty., Patti Saris, Asst. U.S. Atty., Justice Dept., Boston, Mass., for defendants.

### MEMORANDUM

TAURO, District Judge.

A class action was filed in 1972, on behalf of the mentally retarded residents of Belchertown State School, asserting that conditions there were so inadequate that they violated the residents' constitutional and statutory rights. During the next three years, similar actions were filed on behalf of residents of Fernald, Monson, Wrentham and Dever State Schools. Named as defendants were several Massachusetts officials with direct and indirect responsibility for these institutions.

I inspected these institutions and learned first hand that conditions at each of them were deplorable and intolerable. That impression was conveyed to the defendants who, thereafter, agreed to work with plaintiffs and the court in an effort to fashion a series of consent decrees that would remedy the unacceptable conditions under which our mentally retarded citizens were existing. Those decrees were finalized and issued by this court in 1977. Much has been accomplished since then.[1]

Thanks to the enlightened leadership of Governor Dukakis—the determined and even-handed oversight of Attorney General Bellotti—the concerted efforts of state and federal officials—the tireless devotion of the parents, friends and legal counsel of the retarded—the invaluable cooperation of the Children's Hospital Medical Center—the support and responsiveness of our state legislature—the diligence and patience of our three Court Monitors, Steven Horowitz, Anne Berry and Tom Wachtell—and the truly noble dedication of the professional staffs who provide daily care at these schools—it is now clear that we have significantly improved the quality of life for the retarded.

The filth, squalor and unsafe conditions that once characterized these institutions no longer exist. Instead, major capital projects at each of them have been completed or are in progress. Staffing levels have been dramatically increased, thereby providing truly professional supervision, as well as habilitative opportunities. In addi-

---

1. The 160 pages of docket entries in this case reflect, to a degree, the literally thousands of hours the parties have devoted to this remedial process. Five published opinions provide an additional historical perspective. *Massachusetts Ass'n for Retarded Citizens v. King*, 668 F.2d 602 (1st Cir.1981); *Massachusetts Ass'n for Retarded Citizens v. King*, 643 F.2d 899 (1st Cir.1981); *Ricci v. Callahan*, 576 F.Supp. 415 (D.Mass. 1983); *Ricci v. Callahan*, 97 F.R.D. 737 (D.Mass. 1983); *Ricci v. Okin*, 537 F.Supp. 817 (D.Mass. 1982).

tion, a responsive program of community placement has been undertaken.

Of course, these schools are still far from perfect. More work remains to be done. But, given the demonstrated good faith of all concerned, I am confident that I no longer need to actively oversee compliance with these decrees. I have, therefore, fashioned the attached order that will serve as the agenda for their full implementation, under the supervision of an Office of Quality Assurance, to be established within the Governor's office by his Executive Order.

I take this step of disengagement with confidence that our retarded citizens will never again live under the conditions of a decade ago.

\* \* \* \* \* \*

The essential concepts covered by the accompanying order are summarized below.

### 1. ONGOING SERVICE PROVISION.

The defendants are ordered to continue to provide services and housing to all class members [2], and to maintain facilities and equipment, in accordance with the provisions of Title XIX of the Social Security Act and the consent decrees. Notwithstanding the stylistic differences of the various decrees, the overriding substantive principles guiding the court's supervision of each institution have been the same—the standards of care articulated in Title XIX and in the Capital Community Plan. The defendants are required to continue their adherence to those standards.

### 2. OFFICE OF QUALITY ASSURANCE.

At a hearing on March 3, 1986, I informed the parties that, as a condition of my disengagement from these cases, an independent quality assurance oversight

process would have to be established. To this end, the court directs that there be established the *Office of Quality Assurance* (Office). The Office shall be maintained by the Commonwealth for a three year period, to commence on the date of this court's disengagement. The role of the Office is to monitor the quality of care provided to class members, so as to ensure continued compliance with the various orders of this court.

The Office is to be established by the transfer of the current Court Monitor's Office to the supervision of the Governor. The Director of the Office shall be Tom Wachtell, the present Court Monitor. The Office shall be funded in accordance with the budget contained in Appendix A of the accompanying order. An Advisory Panel to the Office shall be established, as specified in Appendix A.

### 3. PERSONNEL.

Required staffing levels and patterns at the various institutions have been established by the Personnel Decree. The court recognizes that these staffing levels and patterns must be sufficiently flexible to meet changing needs. To that end, and in order to ensure proper care for all class members, a process must exist for determining the adequacy of staffing patterns, both at the institutions and in community settings. The defendants have developed such a process, with the valuable guidance of the Department of Health and Human Services. That process was substantially accepted and made an order of the court on August 18, 1986.

### 4. PROJECTS SUBJECT TO COMPLETION.

Notwithstanding the substantial progress that has been made, there are a

---

**2.** For the purposes of this memorandum and the accompanying order, a "class member" is defined as any person residing at, or on the residential rolls of, one of the institutions for thirty (30) consecutive days or more, on or after the following dates: Belchertown, 2/2/72; Fernald, 7/23/74; Monson, 9/17/75; Wrentham, 12/4/75; Dever, 12/17/75. New admissions shall be permitted under the following conditions: 1) a consent decree compliant bed is available; 2) an existing resident, not in a compliant bed, is not appropriate for placement into that bed; and 3) an existing resident is not displaced from consent decree compliant housing to accommodate the new admission. Notwithstanding the above, and as described in Appendix B of the accompanying order, the moratorium on admissions to Dever and Wrentham shall remain in effect.

number of matters that must be resolved in order to ensure that full compliance is achieved and maintained. These items are delineated in Appendix B of the accompanying order. In addition, it is essential that there exist sufficient safeguards and mechanisms to ensure that class members continue to receive the services to which they are entitled. The defendants have committed themselves to establishing and maintaining such safeguards and mechanisms, and these too are identified in Appendix B. It shall be the Director's responsibility to monitor the defendants' progress, so as to ensure full compliance without unnecessary delay.

## ORDER

For the reasons stated in the accompanying memorandum, it is hereby ordered as follows:

1. The defendants shall continue to provide services to all class members, as that term is defined in note 2 of the accompanying memorandum, and to maintain facilities and equipment, in accordance with the standards and requirements of Title XIX of the Social Security Act and the consent decrees. All service provision requirements of the decrees remain in force, as do those provisions requiring Individual Service Plans and the utilization of evaluation and monitoring mechanisms.

2. An Office of Quality Assurance shall be established by an Executive Order of the Governor, in terms consistent with the provisions of Appendix A, attached hereto.

3. The defendants shall maintain personnel levels at the various institutions in accordance with the Personnel Decree and this court's modification order of April 21, 1982. In the event that changes in personnel levels are required, either as a result of community placement or increased resident need, such changes shall be determined and carried out in accordance with this court's memoranda and orders of February 28, 1986, and August 18, 1986.

4. The defendants shall comply fully with all requirements identified in Appendix B, attached hereto, and shall report semi-annually on their progress to the Director of the Office of Quality Assurance (Director) and to the Department of Health and Human Services.

5. During the three years following this court's disengagement, the parties and the Director may seek this court's counsel or clarification as to its orders. Ninety (90) days prior to the end of this three year period, the court shall hold a hearing to review implementation of this final order.

6. All defendant filing requirements with the court, except as specified in this order, are hereby suspended.

7. This court's disengagement shall take effect upon the issuance by the Governor of an Executive Order establishing the Office of Quality Assurance, as described in Appendix A.

It is so ordered.

## APPENDIX A

## OFFICE OF QUALITY ASSURANCE

### INTRODUCTION

To safeguard the health, safety and well-being of class members, the Office of Quality Assurance (Office) shall be created. This Office shall ensure that all class members receive the services to which they are entitled under the consent decrees, and that the Commonwealth comply with all federal and state laws, rules, regulations and standards that are applicable to these class members. Such Office shall be within the state government, report directly to the Governor, and be initially chartered for a three year term. Establishment of the Office shall occur through the transfer of the Court Monitor's Office in its entirety, the appointment of the current Court Monitor, Tom Wachtell, as its Director, and the creation of an Advisory Panel in accordance with the membership requirements included herein. The Office shall function as an independent oversight body within state government.

The Office shall fulfill the duties and functions described herein and shall moni-

tor the implementation of any and all outstanding consent decree requirements, agreements among the parties, commitments made by the Commonwealth and applicable rulings of the court, including but not limited to its final disengagement orders.

The Director shall report to the Governor on the quality of care provided to all class members and on the status of the protection of their rights under the consent decrees and applicable federal and state laws and regulations. For the purpose of meeting his responsibilities, the Director shall have reasonable access to the Governor and the ability to communicate promptly and regularly with him.

Six months prior to the end of the Office's three year term, the Director, after consultation with the Advisory Panel, shall make a recommendation to the Governor as to whether the continued existence of the Office is advisable or necessary to assure quality of services and protection of rights. The Director shall also transmit copies of his recommendations to the court and the plaintiffs' counsel.

Any successor to the first appointed Director shall be appointed by the Governor. The Director shall have full knowledge of the consent decrees, the state's mental retardation service system and agencies delivering such service, and have demonstrated experience in administration and quality assurance. Notice of such successor's appointment, including curriculum vitae, shall be provided to the court and the plaintiffs' counsel.

## STAFFING AND RESOURCES

Adequate resources will be made available to fund the Office in accordance with the budget included herein. The Director shall, in accordance with state rules and regulations, select the staff of the Office, define staff responsibilities, and establish appropriate compensation levels for all employees. The Director, after consultation with the Advisory Panel, shall annually recommend to the Governor any proposed modifications to the Office budget.

## COOPERATION FROM STATE AGENCIES

A number of agencies, including but not limited to the Departments of Mental Health, Public Health, Public Welfare, and Social Services, the Executive Office of Communities and Development, the Division of Capital Planning and Operations, the Rate Setting Commission, the Massachusetts Rehabilitation Commission, and the Massachusetts Commission for the Blind, conduct activities and programs having a direct impact on the quality of care to class members. Notice shall be given to the heads of all such agencies informing them of the duties and responsibilities of the Office and instructing them to notify all of their employees and service providers to cooperate with the Office. Each such agency head shall designate a liaison to ensure that the Director receives full cooperation. Such liaison shall have sufficient authority to represent the agency in matters concerning class members.

## ACCESS TO INFORMATION

The Director and his staff shall be allowed prompt access to all information, records, residential environments, and program areas, including the ability to enter program sites unannounced, and shall be permitted to interview any person affected by or involved in the provision of care to class members.

## RESPONSIBILITIES

The Office shall carry out the following responsibilities:

Monitor implementation of all outstanding agreements among the parties, defendant commitments, and rulings of the court;

Ensure that all state agencies provide class members with services to which they are entitled under the mental retardation consent decrees, and under state regulations;

Advise the Governor and members of his administration in the development of poli-

cies, plans, and programs affecting class members;

Facilitate interagency cooperation relative to the care of class members;

Work with the heads of all relevant agencies, and their designated representatives, to assure compliance with the consent decrees, federal and state laws, rules, regulations, standards, and constitutional guarantees for all class members;

Ensure that the state's quality assurance mechanisms for monitoring services to class members are comprehensive, reliable, and functioning effectively;

Provide vigorous advocacy for class members to ensure that their needs are met and their rights are preserved;

Pursue in-depth analysis of issues or conditions having special relevance to class members;

Advise the Governor and the Secretary of the Executive Office of Human Services (EOHS) of problems that require their direct intervention;

Report to the Governor and the Secretary of EOHS in all instances where agencies fail to correct deficiencies or fail to respond to recommendations or directives of the Office;

Bring to the court's attention for its consideration instances where, in the Director's judgement, the defendants have either failed to comply with or have violated any provisions of the court's final orders; and

Establish its own rules, regulations, and procedures relative to carrying out the above responsibilities.

## TASKS

In order to carry out its mission of assuring a continued high level of care and to execute its responsibilities as set forth above, the Office shall establish its own procedures and mechanisms for monitoring and evaluating the care of class members, and shall undertake the following:

I. *Analysis of Systemic Safeguards*

(a) Conduct systematic reviews of existing quality assurance mechanisms to determine whether agencies are properly assessing the quality of services provided, and to ascertain the extent of compliance with established rules and regulations protecting these citizens;

(b) Receive information, reports, and complaints from employees, class members, their families or representatives, and others regarding the effectiveness and adequacy of quality assurance mechanisms;

(c) With the agencies, identify ways that the quality assurance system should be strengthened or refined;

(d) Identify areas where agencies are failing to comply with and/or enforce applicable federal and state laws, rules, regulations, standards and policies, and outstanding consent decree requirements; and require that those agencies take action to correct inadequacies;

(e) By means of consultation, investigation and inspection, draw independent conclusions relative to the adequacy of care, the protection of individuals' rights, and the effectiveness of quality assurance mechanisms, with specific attention to issues of the safety and security of class members; and subsequently require correction or resolution of problems. A report of the findings of any such activity shall be provided to the head of the appropriate agency, as well as his or her designated manager responsible for such service, and if problems are identified, such designated manager shall make a written report, within a suitable time frame as requested by the Director, of actions taken to correct each of the problems;

(f) Identify and report on areas where agencies and service providers are demonstrating superior efforts in the provision of services to class members.

II. *Individual Advocacy*

(a) Receive information and complaints from class members, their families or representatives, and others regarding the adequacy of care and services to

these citizens; determine whether those individuals have made full use of existing procedures for obtaining services, or otherwise addressing their concerns; and, if they have not, fully inform them of the appropriate mechanisms within the agency for doing so; and if they have sought but not obtained relief from those mechanisms, or if existing mechanisms are inadequate to resolve the problem, recommend or, if determined necessary by the Director, mandate a means of resolution;

(b) Receive all formal investigations conducted on behalf of class members under the Department of Mental Health Regulations, Mass.Regs.Code tit. 104, §§ 24.00–.13 (1984); if necessary advise the persons in charge of an investigation as to the adequacy and sufficiency of those investigations; if necessary request that the Commissioner conduct a Commissioner's Investigation into the matter in accordance with Mass.Regs.Code tit. 104, § 24.-12(6) (1984); and if necessary request the Investigative Unit of the Executive Office of Human Services to investigate the matter;

(c) Receive all formal investigations of complaints conducted on behalf of class members by the Department of Public Health under the Federal Certification Regulations, 42 C.F.R. §§ 442.-400–.516 (1985); if necessary advise the persons in charge of such investigations as to their adequacy and sufficiency; and if necessary request the Investigative Unit of the Executive Office of Human Services to investigate the matter;

(d) Ensure that all cases of alleged abuse or neglect of class members that come to the Office's attention are reported to the appropriate authorities, agencies, and commissions responsible for pursuing and investigating such allegations.

III. *Advising and Reporting to the Administration*

(a) Advise appropriate agency heads, the Secretary of EOHS and the Governor as to the sufficiency and adequacy of proposed agency budgets and periodic spending plans relative to class member services;

(b) Report to the Governor and the Secretary of EOHS on the advisability and appropriateness of proposed legislation and agency regulations affecting services to class members and to suggest where legislation, rules, and regulations might be needed;

(c) Report at least annually to the Governor and the Secretary of EOHS, and from time to time as the Director deems necessary, on the quality of services provided to class members, the completion of all outstanding state commitments and obligations, the effectiveness of the state's various quality assurance mechanisms, and the success or failure of agencies' enforcement of their rules and regulations; and provide copies of such reports to appropriate federal oversight agencies, the plaintiffs' counsel, and the court;

(d) Issue special reports as needed on issues or conditions identified in the course of the Office's oversight function.

IV. *Ongoing Monitoring*

(a) Request and receive periodic reports from agencies on compliance with rules and regulations governing the care of class members;

(b) Request and receive periodic status reports on the progress towards completion of outstanding state commitments, from the responsible agencies;

(c) Determine what ongoing periodic reporting procedures previously provided to the Court Monitor's Office and the court (including but not limited to court reporting forms, death reports, class member identification lists, reports of facility admissions, etc.) should be provided to the Office;

(d) Maintain contact with federal oversight agencies to identify areas of concern where the Commonwealth has not

complied with federal standards and to ensure that the appropriate state agencies devise means for implementing compliance.

V. *Facilitation and Technical Assistance*

(a) Request representatives from the various agencies to meet, for the purpose of addressing problems of an interagency nature affecting the adequacy of services to class members;

(b) Develop communication networks with protection and advocacy agencies;

(c) When necessary, call upon existing state personnel or other experts to consult with and advise the Office on matters pertaining to class members.

## ADVISORY PANEL TO THE OFFICE OF QUALITY ASSURANCE

### INTRODUCTION

The plaintiff representatives and the Secretary of Health and Human Services have provided invaluable advice to the court during the pendency of these cases. To ensure their continued involvement and assistance, as the court ends its direct oversight of these decrees, there shall be established an Advisory Panel to the Office of Quality Assurance. Such Advisory Panel shall advise and assist the Office in carrying out its responsibilities as described below.

The Advisory Panel shall consist of 7 members and shall be constituted as follows:

One representative from each of the five state school parents' associations, to be chosen by each association, so long as such person is a parent, guardian or member of the same family as a class member;

One person designated by the Massachusetts Association for Retarded Citizens (MARC), so long as such person is a member of MARC or on its Board of Directors, and is a parent, guardian or member of the same family as a class member; and

The Secretary of Health and Human Services or his designee.

### FUNCTIONS AND DUTIES

The Advisory Panel shall meet at least quarterly with the Director, and at other times as the Director deems necessary and shall:

Assist the Director in planning and reviewing the activities of the Office;

Review periodic reports from the agencies regarding their quality assurance mechanisms, including but not limited to reports on their compliance with rules and regulations governing the care of class members and their implementation of outstanding state commitments under the consent decrees; and based upon those reviews, recommend to the Director for his consideration, issues that need to be pursued;

At the Director's request, review such additional reports and materials that would enable the Office to more effectively evaluate the care of class members;

Bring issues to the attention of the Office that either aid in its evaluation of the quality of care to class members or warrant its intervention;

As the Director deems necessary and appropriate, accompany Office staff on visits to selected program locations; and

Serve as a vehicle for communication between the Commonwealth's citizenry and the Office, through activities including but not limited to receiving reports and information from citizen monitoring groups established by the Department of Mental Health or other agencies.

The Director shall, in accordance with the Office's budget, make available to the Advisory Panel secretarial support and supplies, and reimbursement for reasonable expenses, to enable the Advisory Panel to carry out its functions and duties.

OFFICE OF QUALITY ASSURANCE
ANNUAL BUDGET

| ITEM | | AMOUNT |
|---|---|---|
| STAFFING – (02 Subsidiary) | | $257,400 |
| (Director | 52,400) | |
| (Deputy Director | 44,000) | |
| (Quality Assurance Systems Monitor | 33,750) | |
| (Individual Advocacy Monitor | 33,750) | |
| (Coordinator of Support Services | 29,000) | |
| (Field Monitor | 25,000) | |
| (Research Analyst | 21,000) | |
| (Secretary/Receptionist | 18,500) | |
| CONSULTANTS – (03 Subsidiary) | | 10,000 |
| Legal | | |
| Clinical | | |
| Systems-Management | | |
| TRAVEL – (10 Subsidiary) | | 8,000 |
| PRINTING – (11 Subsidiary) | | 3,200 |
| OFFICE SUPPLIES & TELEPHONE – (14 Subsidiary) | | 9,500 |
| EQUIPMENT – (15 Subsidiary) | | 16,000 |
| 2 Memory Typewriters | | |
| 1 IBM AT or compatible computer, printer, software | | |
| Office furniture and file cabinets | | |
| XEROX RENTAL – (16 Subsidiary) | | 4,600 |
| TOTAL | | $308,700 |

## APPENDIX B

## PROJECTS SUBJECT TO COMPLETION

### ITEMS PERTAINING TO CLASS MEMBERS FROM ALL SCHOOLS

As a priority matter, the defendants shall do all that is necessary to complete their "Housing Agenda" and provide adequate housing for all class members by October, 1987, in accordance with the schedules submitted to the court. The defendants shall report at least quarterly to the Office of Quality Assurance on their progress towards completion. If at any time the Director determines that timely completion of the Housing Agenda is in jeopardy, he shall recommend to the Governor actions which may be necessary to ensure completion within the established time frames.

On March 11, 1986, the Deputy Commissioner for Mental Retardation reported to the court on the defendants' plans for maintaining and improving their quality assurance mechanisms to ensure that progress made to date will be maintained and to effectively monitor and evaluate programs and services provided to class members. The defendants shall continue to strengthen and refine such mechanisms in accordance with the March 11, 1986 report and shall modify and add to these processes as appropriate.

The Director of the Office of Quality Assurance shall direct a study, with the cooperation of appropriate state agencies, to review problems that currently exist in recruitment for certain hard to fill professional positions such as those in Occupational Therapy, Physical Therapy, and Speech Therapy; and shall recommend to the administration steps to be taken to resolve the problems identified.

The Director of the Office of Quality Assurance shall monitor the defendants' progress in implementing their "Plan For Ensuring That Class Members Residing In Nursing Homes Receive Appropriate Ser-

vices", submitted to court on November 22, 1985.

The defendants shall ensure that Independent Professional Reviews (IPR's) are conducted for all class members at the state schools or in ICF's/MR, for all Dever and Wrentham class members in the community, and for all class members being served in programs funded through the Title XIX Omnibus Waiver program.

The defendants shall continue to provide "Court Reporting Forms" to the Office of Quality Assurance, and to an appropriately designated individual representing each plaintiff group.

The Director of the Office of Quality Assurance shall work with administration officials to resolve problems faced by private providers in recruiting and retaining qualified staff in community programs.

The Director of the Office of Quality Assurance, with the cooperation of appropriate state agencies, shall review current practices relative to the training, evaluation and certification of program staff, and if necessary shall recommend changes to enhance the effectiveness of such practices.

The Director of the Office of Quality Assurance shall review the adequacy of services provided to class members residing at Hogan/Berry Regional Center, and if necessary shall recommend to the administration actions that may be required to ensure that these class members receive services to which they are entitled.

The defendants shall work toward resolving inconsistencies in state building codes that apply to the use of staffed apartments for mentally retarded persons.

The defendants shall develop standards for readmission to state schools and take steps to ensure that the standards are uniformly applied throughout the state.

The defendants shall ensure that new admissions to the state schools are restricted only to persons who are appropriate for residency at a facility for persons with mental retardation. Within sixty days, the defendants shall develop a formal policy, acceptable to the Director of the Office of

Quality Assurance, to ensure adherence with this requirement.

The defendants shall use their best efforts to ensure the availability of funds to provide adequate preventive and current maintenance of buildings and grounds, systems and vehicles for all programs and facilities serving class members.

Within ninety days, the defendants shall develop a formal policy and process for parent/family monitoring of programs that will provide reasonable access to all programs serving class members.

The defendants shall ensure that adequate transportation is provided at the facilities and in the community to assure that class members have ready access to services and leisure time activities.

The defendants shall ensure that all programs serving class members, including Specialized Home Care and Day Habilitation programs, are properly regulated and monitored.

There shall be established, upon the recommendation of the Director of the Office of Quality Assurance, and after consultation with the parties, a committee at each state school to assist the superintendents in the following areas:

* planning for the optimum utilization of space;

* reviewing where changes in the use of space may be warranted, and determining what, if any, modifications might be necessary—so long as such changes or modifications are consistent with the requirements of this final order and do not interfere with the defendants' compliance therewith;

* identifying and eliminating building deficiencies and impediments to proper use or occupancy;

* planning for future use of buildings that are or will be vacated as a result of either reduced census or the renovation of other space; and

* acting as a clearing house to identify space needs and to review facility-wide options and priorities.

The committees shall:

* have adequate representation from families or guardians, plaintiff representatives, and staff from each facility; and
* be authorized to request the appointment of a professional architect or engineer to advise the committees in the performance of their duties.

The Director's recommendation shall include a process of dispute resolution within DMH and provide a mechanism for the parties to seek the assistance of the Office of Quality Assurance in the event that a consensus cannot be reached on issues under review.

### ITEMS PERTAINING ONLY TO BELCHERTOWN STATE SCHOOL

E & F Buildings shall be closed. The defendants' current planning will lead to closing by July, 1987.

The Infirmary shall be closed. The defendants' current planning will lead to closing by July, 1987.

In the event that the closing of the Infirmary is to be substantially delayed, the Office of Quality Assurance shall review and recommend to the administration whether the installation of incandescent lighting is needed.

The defendants shall improve the electrical distribution system in accordance with the current scopes of work and court-approved schedules.

The Superintendent shall review the plaintiffs' concerns relative to G Building and the Cottages and submit a plan to the Director of the Office of Quality Assurance in ninety days with a view towards improving the quality of life for class members residing in those buildings.

### ITEMS PERTAINING ONLY TO MONSON DEVELOPMENTAL CENTER

The recreational area adjacent to Longview Building shall be developed in accordance with resident needs.

The defendants shall provide additional adequately designed program space to meet the needs of Monson class members. This is to be accomplished either by the conversion of existing space or, if necessary, the provision of additional space.

### ITEMS PERTAINING ONLY TO FERNALD STATE SCHOOL

Greene Building shall be completed in accordance with current court-approved schedules, with the proviso that it will not be occupied until problems with the HVAC system are corrected.

Schoolhouse Program Building, Manual/Training, and Thom Hospital shall be completed in accordance with current court-approved schedules.

Woodside and Brookside shall be converted to program space. The timetable shall be established once a determination is made as to the necessary structural modifications.

The defendants shall be bound to utilize the Farrell process for the following projects until such time as they are complete: Manual/Training, Schoolhouse, Thom Hospital, and the conversion of Woodside and Brookside to program space.

The Valley Barn project at Templeton shall be completed and the facilities shall be made fully ready for use as expeditiously as possible.

A disposition regarding the use of Fernald's excess facilities will be made by the parties upon consideration of the recommendations of the Space Utilization Committee.

The defendants have committed $208,000 for additional sitework renovations at Fernald. The determination of the specific allocation of those funds shall include a committee process that includes plaintiff representation. If found necessary, a portion of the funds could be used for additional parking lots. Once this work is completed, the Director of the Office of Quality Assurance shall review the impact of such renovations and recommend additional sitework improvements if they are necessary

to ensure the safety of residents on campus.

The defendants shall take whatever steps are necessary to ensure that all renovated buildings at Fernald, including "Package A" and "Package B" buildings, have been renovated adequately, that all mechanical systems are functioning correctly, and that all construction deficiencies are corrected. They shall report to the Office of Quality Assurance within thirty days what actions they are taking to this end, and provide monthly status reports thereafter until such time as all problems are resolved.

No building currently under construction/renovation shall be occupied unless and until it is adequate to meet the needs of the residents for whom it is intended.

The defendants shall immediately take all steps necessary to ensure that residents at the Templeton Colony receive adequate heat.

The defendants shall repair the roof leaks in the residential lodges at Templeton.

The defendants shall immediately make all necessary repairs to the steam boilers at the Waverly campus to ensure an adequate and safe supply of steam.

The defendants shall take all steps necessary to increase the hot water supply in Farrell Hall to more adequately meet the residents' needs.

The defendants have contracted for a study of the food service system at the Waverly campus to be completed by February, 1987. Upon its completion, the defendants shall immediately take all steps necessary to ensure that Fernald's food service system is adequate to meet the needs of class members. Consideration shall be given to the feasibility of utilizing an external, contracted food service to either supplement or replace the current on-campus services.

A wheelchair ramp shall be added to the administration building.

There will be an annual review of furnishings and equipment through a computerized inventory process.

The defendants shall ensure that residents who require a climate controlled environment for medical reasons, including any such class members currently residing in Wallace and in the Shriver Medical Unit, are provided with such an environment. They shall report to the Office of Quality Assurance within ninety days on their plans in this regard.

If the defendants decide to convert either Wheatley or Lavers to program space, they shall ensure that the design and renovation of these buildings are adequate to meet the needs of the residents who would be served there.

## ITEMS PERTAINING ONLY TO DEVER STATE SCHOOL

Buildings 2, 6, 8, 10, 12, and 14 shall be closed as the defendants implement the Housing Agenda. In addition, the defendants shall provide the parties with a plan, by October 1, 1986, for consolidating living areas for the remaining class members that ensures that the closing of buildings does not result in overcrowding.

The defendants shall renovate and improve the Cafeteria in accordance with the current scopes of work and court-approved schedules.

By January 1, 1987, the defendants shall perform all necessary repairs on the Fremont North and Knoll ICF's/MR.

The Dever Hospital Building does not comply with Title XIX standards and is therefore not adequate for residents who might reside there on either a short or a long term basis. The defendants shall report to the Office of Quality Assurance by February 1, 1987, what actions they are taking to either close the Hospital and provide services at other locations either on or off campus, or renovate the building so that it complies with all relevant Title XIX standards. The defendants shall consider what residential and medical needs are provided for in this facility, the medical needs of the residents of the school, and the need to replace any equipment utilized at the current facility.

The defendants shall repair the porch on the second floor of the Fenton Building so that it is available for resident use.

## ITEMS PERTAINING ONLY TO WRENTHAM STATE SCHOOL

The new Raymond Hospital shall be completed in accordance with the parties' "Joint Motion To Amend Wrentham Consent Decree" of January 23, 1985, which was approved by the court on February 20, 1985.

The Quinn School pool renovations shall be completed by November 21, 1986.

## ITEMS PERTAINING ONLY TO DEVER AND WRENTHAM

The moratorium on admissions to Dever and Wrentham shall be continued until such time as the populations at each facility have been reduced to the number of beds that have been fully renovated pursuant to the Dever and Wrentham consent decrees.

The defendants shall install some sidewalks, improve others, and repair and install streetlights at Dever and Wrentham, in accordance with scopes of work developed in 1982. The cost is estimated to be approximately $335,000 at each facility. Once this work is completed, the Director of the Office of Quality Assurance shall review the impact of such renovations and recommend additional sitework improvements if they are necessary to ensure the safety of residents on campus.