MASSACHUSETTS ASSOCIATION FOR RETARDED CITIZENS et al.,
Plaintiffs-Appellees,

v.

Edward J. KING et al.,
Defendants-Appellants.

No. 80–1061.

United States Court of Appeals,
First Circuit.

Argued Nov. 7, 1980.

Decided March 18, 1981.

---

1. *E. g., Gual Morales v. Hernandez Vega*, 604 F.2d 730, 732 (1st Cir. 1979).

Alan B. Sherr, Asst. Atty. Gen., Government Bureau, Dept. of Atty. Gen., Boston, Mass., with whom Francis X. Bellotti, Atty. Gen., Joan C. Stoddard and Donald K. Stern, Asst. Attys. Gen., Government Bureau, Dept. of Atty. Gen., Boston, Mass., were on brief, for defendants-appellants.

Nonnie S. Burnes, Boston, Mass., with whom Richard W. Renehan, Robert G. Bone and Hill & Barlow, Boston, Mass., were on brief, for plaintiffs-appellees.

Before CAMPBELL and BOWNES, Circuit Judges, and HOFFMAN,* District Judge.

BOWNES, Circuit Judge.

Defendants-appellants Edward J. King, et al., appeal what they assert are "orders" of the district court, issued in the five consolidated cases concerning the rights of mentally retarded citizens of the Commonwealth of Massachusetts. They claim that these oral "orders," made during the course of a district court hearing, alter the terms of the Personnel Decree entered into by the parties. We hold that the statements of the district court were not "orders" and that they, therefore, are not appealable.

This action arises out of five cases, filed as class actions on behalf of residents of five state schools for the mentally retarded. The first of those cases, brought in 1972, involved the Belchertown State School; the remaining suits, filed in 1974 and 1975, centered upon the Fernald State School, the Monson Developmental Center, the Wrentham State School and the Dever State School. All were suits against various officials of the Commonwealth of Massachusetts, principally the Commissioner of the Department of Mental Health (DMH). These cases were consolidated in the district court, and were ultimately settled through consent decrees.[1] In addition to and separate from the five individual consent decrees, the parties entered into a "Final Decree on Personnel at the Five State Schools for the Mentally Retarded" (the "Personnel Decree").

The Personnel Decree reduces to numerical form the personnel figures thought to satisfy federal requirements.[2] The process by which the parties reached agreement was lengthy and complex.[3] The district

---

* Of the Eastern District of Virginia, sitting by designation.

1. The consent decrees dealt with four principal areas: (1) construction and renovation at the state schools; (2) increasing the number of professionals and other staff at the schools; (3) upgrading the quality and quantity of services provided to residents; and (4) developing community residential facilities.

2. The parties recognized that standards were needed to guide them in filling the large number of new positions required by the consent decrees. They looked to federal statute—Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 et seq.—which provides for the reimbursement of institutions that render services under the joint federal/state Medicaid program. All five schools serve a large percentage of their residents pursuant to that program. As a condition for receipt of funds, the providers must comply with the generally nonspecific personnel requirements of Title XIX and its implementing regulations. Because of the lack of specificity in the statute and regulations, the parties to the various consent decrees outlined criteria for determining the staffing levels needed to meet the general health and service standards of Title XIX.

3. In their first study, defendants relied upon estimates of the Department of Public Health (DPH) (the federal representative in Massachusetts with the task of ensuring that certain Medicaid providers comply with Title XIX), and complemented those figures with the opinions of the school superintendents, outside experts and the Department of Mental Health staff. As a result of their own restudy, the defendants voluntarily raised the commitment considerably in the area of staff personnel; the figures were revised upward once again in response to the studies of the superintendents of the five schools, conducted pursuant to an order of the district court. In the last stages of the process, the parties, with the input of the DPH, engaged in lengthy negotiations, not simply with respect to the number of staff, but also with regard to the problems of recruitment and training.

court approved the final Personnel Decree on August 2, 1978. The decree superseded several earlier personnel agreements and was ultimately incorporated into the Interim Consent Decree, setting forth the basic obligations of the defendants to the plaintiff class. In the Personnel Decree, the defendants agreed to add 2,047 positions at the five state schools and delineated plans for staff recruitment and training.

The implementation pace varied among the schools, contingent upon such factors as transportation networks, local employment and the capacity of the institutions to absorb new staff.[4] To assist in the implementation process, the district court, at the suggestion of the parties, appointed a Court Monitor, on March 5, 1979.[5] Moreover, throughout the implementation phase, the district court conducted many hearings to assess the defendants' progress. Some were held at the behest of the court, others at the request of the parties or the Court Monitor. This appeal stems from one of those hearings.

On October 31, 1979, the Court Monitor submitted to the parties "Report # 4: A Special Report on Personnel: Establishing Deadlines to Implement Consent Decree Staffing Requirements." The report dealt with such subjects as the meaning of "compliance" under the Personnel Decree, vacancy rates and staff to client ratios, the role of the Department of Public Health, the role of the district court with respect to federal standards, and strategies for eliminating vacancies. By an October 31 order of the court, a hearing was scheduled for November 15, 1979, "for the purpose of discussing matters affecting compliance with the personnel decree of August, 1978." Specific topics to be addressed included the Court Monitor's report and recommendations on compliance deadlines (contained in his October 31 report).

The November 15th hearing on the Court Monitor's report focused for the most part on the meaning of compliance. The defendants argued in the course of the hearing that compliance did not require that all 2,047 positions be filled, that paragraph 7 of the Decree allowed for a five percent vacancy rate.[6] The Court Monitor's report stated that paragraph 7 requires special efforts on the defendants' part, whenever vacancies exceed five percent, but that "no explicit allowance for such a vacancy rate is

---

4. By November 1978, retention had become the thorniest problem confronting the schools. In an effort to overcome the difficulties resulting from the attempt to absorb quickly a dramatic increase in staff, appellants tried many things, including substantially raising salaries for both professional and direct care staff, and establishing four-day work weeks and flexible time schedules.

5. The Court Monitor is "responsible solely to the Court," and is required to file periodic comprehensive written reports with it about progress toward implementation. He may informally propose solutions to problems hindering compliance and make formal recommendations to the defendants which are binding absent timely objection.

6. Paragraph 7 of the Personnel Decree, upon which appellants rely, states in pertinent part:
     The defendants recognize the need to attain and then preserve full staffing of positions in order to meet the needs of residents as set forth in Title XIX. Accordingly, defendants will (a) engage in aggressive recruiting to obtain qualified applicants, (b) develop and operate the training program described in Attachment F (to be provided to the Court) for all applicants who are hired, and (c) follow the steps set forth in Attachment F whenever the personnel vacancy rate exceeds 5 percent. The defendants agree to submit regular vacancy reports to the plaintiffs. These reports will include *inter alia* specific references to job categories where high vacancy rates have occurred. The defendants will use their best efforts to minimize vacancies, absenteeism, and turnovers in staff. If state pay levels fail to attract qualified professionals and other staff necessary to meet the needs of the residents, the defendants will use their best efforts to change the affected pay levels, or provide the necessary staff through contracts for services, or use other means deemed effective in achieving full staffing.
Defendants also invoked, among other parts of the Personnel Decree, paragraph 4 which declares in part: "The state defendants agree that they will make every reasonable effort to secure enactment of such appropriations as may be necessary to fund the hiring of the positions listed in Attachments A–E."

incorporated in this or any other section." [7] The Court Monitor further recommended that "[i]n the absence of a specific statement to the contrary . . . 'full staffing' be interpreted as a 100% fill rate of authorized positions, not 95%." [8] In other words, defendants would not be in compliance until the 2,047 positions specified in the decree were filled. The Court Monitor also recommended that a motion to the court be submitted for any modification of the personnel decree.

The matter of what constitutes personnel compliance is important to a determination of the issue of staff reallocation. The Personnel Decree, as the Court Monitor indicated, foresaw the process of staff reallocation—the movement of staff members into community based programs in conjunction with the transfer of residents of state schools to community settings (see Personnel Decree ¶ 10). [9] All parties agree with the general proposition that reallocation of staff from the schools to the community programs should not take place if the defendants are in violation of the Personnel Decree. The defendants claim that they would like to begin the transfer process.

Whether they can do so is contingent upon compliance with the Personnel Decree. Hence the importance of resolving the question of whether the defendants are in compliance.

In addressing the compliance issue at the November 15th hearing, the court stated:

> Let me tell you this. Compliance is 100 percent. That is what I am looking for, 100 percent.
>
> Anything short of 100 percent, you have to file a motion here and be relieved.

It further explained:

> The decree is to be complied with literally. Whatever the numbers call for in the decree, they are to be complied with to the number.
>
> If you seek relief from a particular requirement of the decree, whether it be a date, a number in terms of personnel, a date for completion of a building, a date to report or anything else, you must come to this Court with a motion, timely filed, and request relief.
>
> You are not to assume the authority for any de minimis rule. You are not to

---

7. The Court Monitor's report noted that Paragraph 2 of the Personnel Decree states that "[t]he defendants' continuing commitment under the terms of this Decree is to comply with the personnel standards for care and treatment set forth in Title XIX of the Social Security act, . . . and regulations promulgated thereunder." The Decree, the report continued, "explicitly requires the defendants to add 2047 positions to the current staff levels." Paragraph 3 states: "The positions which the defendants will add to the personnel requirements at all institutions for the retarded in order to satisfy the requirements of Title XIX totals 2328 [2047 if only the five state schools are included]" (footnote omitted). In support of his position, the Court Monitor quoted further from Paragraph 3:

> The parties agree that the positions listed in Attachments A–E represent an appropriate level of personnel for each of the state schools when added to the current staffing levels, including staff called for by contractors with outside providers. Accordingly these positions represent a final settlement of the personnel part of the above-captioned cases.

8. Interestingly, however, the Court Monitor did recognize that "the realities of institutional management indicate that an irreducible 2–5%

vacancy rate will exist in most facilities" and supported efforts by the parties to study alternative methodologies that might be used in measuring compliance. But, the Court Monitor suggested that the numerical requirements of the Personnel Decree be utilized until the parties agreed on an alternative methodology.

9. Paragraph 10 of the Personnel Decree provides in part:

> The parties agree that as the resident population at each school decreases below the projected population due to the transfer of residents to community-based facilities or through attrition, the staff levels will be correspondingly adjusted. To the degree that reduction in the resident population is caused by successful community transfer, the defendants agree to shift resources into community settings, including those of former residents insofar as possible, and to provide adequate training programs for staff who can continue to perform in noninstitution settings. Prior to any decision to adjust staffing at any state school, the defendants agree to consult with the plaintiffs' counsel and to bring any disagreement to the attention of the Court for its resolution.

assume that you may allocate from one institution to another. You are not to assume any such thing.

You are to comply literally with the terms of the decree.

The court, however, did remark:

I don't want you to feel as though you are prohibited from doing anything. What I want you to understand is that if you want to depart from the standards that are called for both in the gross percentages, gross ratios and the specific allocation position by position, then you must come in here and get relief.

The reason that I insist on that is not because I want to run your institution. Indeed, I do not. It is because it's the only way I know of to maintain control over this rather broad problem, and I don't want to lose control over it.

With regard to the effect of the Department of Public Health's survey to determine whether the schools were in compliance with federal standards, the court noted that the study "will be a source of information on compliance to be weighed by the court. The court may bar proposed reallocations if it finds that title XIX standards are not being met, even if the Department of Public Health finds otherwise."

On November 19, 1979, the defendant moved that the district court commit its "orders" to writing to avoid any uncertainty as to their meaning. The court did not act on this motion. The defendants moved on November 26, 1979, that the court vacate its oral "orders" of November 15 and allow the defendants to present additional material in support of their position with respect to the meaning and effect of the Personnel Decree.

At a hearing on December 15th, the district court refused to either reconsider or vacate the terms of compliance or the procedural requirements for relief set at the November hearing. Although the court had at the November hearing characterized its statement with respect to the Personnel Decree as an order, it stated at the hearing on December 18, 1979:

With respect to that motion to vacate to reconsider, I've already made some comments which I think cover that. I don't consider I have an order outstanding which needs to be reconsidered. That's my position with respect to these decrees. they [sic] are to be considered literally.

If you think that's an appealable statement, then appeal it.

The court did note, however, that it would be very much influenced by requests for relief from the decree, if supported by the Court Monitor, and particularly by the parties. The judge commented once again that he was "not saying that the decree cannot be varied or may not be varied, but will be done so only by leave of this Court so I can manage this case."

Appellants bottom their appeal on the grounds that the hearing statements of the court were "orders" appealable under 28 U.S.C. § 1291 or 28 U.S.C. § 1292(a)(1).[10] On the merits, they argue that the district court erred in its determination that defendants must achieve a zero percent staff vacancy rate at the five schools for the mentally retarded in order to be in compliance with the Personnel Decree, and that they may not reallocate staff from the schools to community programs unless the

---

**10.** 28 U.S.C. § 1291 provides:

The courts of appeals shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, except where a direct review may be had in the Supreme Court.

28 U.S.C. § 1292(a)(1) states:

(a) The courts of appeals shall have jurisdiction of appeals from:

(1) Interlocutory orders of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, or of the judges thereof, granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions, except where a direct review may be had in the Supreme Court.

vacancy rate is zero percent or the court decides that circumstances warrant amendment of the Personnel Decree to permit the reallocation. Appellants also contend that the district court violated principles of equity and of federalism. For their part, appellees argue that the determinations of the district court are not appealable; that, even if the orders are appealable, they are well within the discretionary power of the district court to interpret or modify the terms of a consent decree; and that the issues of federalism or equitable jurisdiction are of minimal relevance in a case settled by consent decree.

Because we cannot review an action of the district court unless it is appealable, logic dictates that we consider the matter of appealability at the outset. Typically, a district court order is subject to review because it is either a final decision, 28 U.S.C. § 1291, or an interlocutory injunctive order, 28 U.S.C. § 1292(a)(1).[11] The appealability issue usually centers on one of two questions: whether the order is "final" [12] or whether the order is "injunctive." [13] The inquiry involves classifying orders already determined to be orders. In the case at hand, an even more fundamental issue is before us—whether the statements of the district judge can be termed "orders" at all.

■ Our review of the hearings shows that in the context of a discussion regarding the Court Monitor's report, the district court talked about the obligations of the parties and the process through which they could seek relief. Although the court's words were forcefully expressed, we do not think they can be characterized as "orders." Nothing that the court said compelled the parties to change their behavior. Moreover, they were not prevented from doing so. This is not a case in which the court denied a motion from which a party appeals. Nor did the court declare that it would not consider motions for relief from the decree; quite to the contrary. The defendants did not make such a motion. Appellants ask, in effect, that we assume that the district court would deny a motion that they have yet to make and that we then review this hypothetical denial.

We conclude that the district court correctly stated at the December hearing that it did not have an order outstanding; whatever the nomenclature used at the November hearing, the statements were not "orders." Cases of this kind are particularly difficult because they involve courts in the task of designing social policy and restructuring institutions. Given the intricacies

---

**11.** We are not suggesting that these are the only avenues permitting review. For example, two less commonly invoked statutes allowing discretionary review of interlocutory orders are 28 U.S.C. § 1292(b) and the All Writs Act, 28 U.S.C. § 1651(a). *See generally* C. Wright, Law of Federal Courts § 102, at 512–18 (2d ed. 1976).

**12.** The traditional definition of a "final order" is "one which ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Catlin v. United States*, 324 U.S. 229, 233, 65 S.Ct. 631, 633, 89 L.Ed. 911 (1945). Because of the problems resulting from a strict application of that definition, courts have recognized a "twilight zone of finality," *Gillespie v. United States Steel Corp.*, 379 U.S. 148, 152, 85 S.Ct. 308, 310, 13 L.Ed.2d 199 (1946), within which finality should "be given a 'practical rather than a technical construction.'" *Id.* Deciding whether an order falls within the "twilight zone" is not without difficulty. *See, e. g., Thoms v. Heffernan*, 473 F.2d 478, 481–82 (2d Cir. 1973), *vacated on other grounds*, 418 U.S. 908, 94

S.Ct. 3199, 41 L.Ed.2d 1154 (1974); *Mahaley v. Cuyahoga Metropolitan Hous. Auth.*, 500 F.2d 1087, 1090–91 n.3 (6th Cir. 1974). On the problems of assessing finality, *see* Redish, *The Pragmatic Approach to Appealability in the Federal Courts*, 75 Colum.L.Rev. 89 (1975).

The final judgment rule is sometimes interpreted flexibly to permit review. For instance, orders which are not final dispositions may be immediately appealed if they satisfy the criteria of the collateral order exception to the final judgment rule. For discussions of this exception, *see In re Continental Investment Corp. v. (Wallace and Wallace)*, 637 F.2d 1 at 4 (1st Cir. 1980); *United States v. Sorren*, 605 F.2d 1211, 1213 (1st Cir. 1979); *In re Grand Jury Proceedings*, 580 F.2d 13, 17 (1st Cir. 1978).

**13.** Because the statutory language is of virtually no assistance, courts have been left with the task of providing 28 U.S.C. § 1292(a)(1) with meaning. *See, e. g., Robbins v. George W. Prescott Pub. Co., Inc.*, 614 F.2d 3, 5 (1st Cir. 1980); *United States v. Cities Service Co.*, 410 F.2d 662, 663 n.1 (1st Cir. 1969).

involved, it is especially important that the issues before us be framed in a manner appropriate for review.

Because the statements are not "orders," they cannot be appealed pursuant to 28 U.S.C. § 1291 or 28 U.S.C. § 1292(a)(1). It follows that we lack jurisdiction to consider the merits.

*Dismissed.* No costs to either party.