**Robert Simpson RICCI, et al., Plaintiffs,**

v.

**Robert L. OKIN, M.D., et al., Defendants.**

**Civ. A. Nos. 72–0469–T, 74–2768–T, 75–3910–T, 75–5023–T and 75–5210–T.**

United States District Court, D. Massachusetts.

Jan. 22, 1992.

Nonnie S. Burnes, Hill & Barlow, Beryl W. Cohen, Boston, Mass., for plaintiffs.

Douglas Wilkins, Asst. Atty. Gen., Kim E. Murdock, Gen. Counsel, Dept. of Mental Retardation, Judith Yogman, Asst. U.S. Atty., Boston, Mass., for defendants.

## MEMORANDUM IN RESPONSE TO DEFENDANTS' REQUEST FOR CLARIFICATION

TAURO, Chief Judge.

This court held hearings on October 28, November 25, and December 9, 1991 to discuss several matters pertaining to the

---

Paul A. Dever State School ("Dever").[1] The October 28 hearing was scheduled because of reports from the Office of Quality Assurance ("OQA") and the Department of Public Health ("DPH") that serious deficiencies existed in the delivery of services to class members residing at Dever.

During the October 28 hearing, this court asked the Health Care Finance Administration ("HCFA")[2] to conduct a full survey of Dever in order to determine the extent and pervasiveness of the problems there. HCFA reported at the November 25 hearing that many serious deficiencies existed. Indeed, HCFA informed the court and the defendants that the cited deficiencies must be corrected by February 13, 1992 or Dever would lose its Medicaid certification and its federal funding.

HCFA's survey determined that the deficiencies at Dever were primarily associated with organization, utilization and training of staff. At the hearing, it was made clear that an additional problem at Dever was the adverse impact on staff and residents that followed Governor Weld's June, 1991 announcement that Dever would be closed within three years.[3] Unfortunately, this concept for consolidation was announced even though no specific implementation plans had been formulated. Shortly thereafter, employee absenteeism at Dever rose dramatically. Staff morale, already shaken by layoffs initiated in November, 1990, plummeted. In August the school's Superintendent resigned.

This court has noted on a number of occasions that the Consent Decrees, and subsequent orders of the court, clearly establish procedures for the allocation of staff resources, as well as processes for making community placements in accordance with each class members' Individual Service Plan ("ISP").[4]

Consistent with those long established procedures, the court has made it clear that, until a detailed plan is in place for the relocation of Dever residents and the reallocation of related resources, the defendants should not consider the closure of Dever a certainty. The court has also made clear that, during any phase out of Dever, all services and staffing levels must be maintained in accordance with Consent Decree standards and this court's orders. These points were reiterated at the December 9, 1991 hearing during which time the court discussed language in a personnel advertisement that assumed the closure of Dever in three years.[5]

The purpose of this memorandum is to once again clarify the defendants' obligations to class members in proceeding with development of plans for implementing the Governor's various proposals to consolidate facilities for the mentally retarded. The court is not opposed to the

---

1. For a history of the litigation associated with this case, *see Ricci v. Okin,* 537 F.Supp. 817, 819–822 (1982).

2. HCFA, a division of the Department of Health and Human Services, is responsible for certifying institutions under the Title XIX Medicaid program.

3. The Governor's declaration was made as part of a larger plan to consolidate several institutions operated by the Department of Mental Retardation, Department of Mental Health, and DPH. *See* Actions for Quality Care: A Plan for the Consolidation of State Institutions & for the Provision of Appropriate Care Services (June 1991) ("Consolidation Plan").

4. Each resident has his or her own service plan. These plans are developed under the supervision of a qualified mental retardation professional. They address the individual's residential and programmatic needs, vocational work needs and capabilities, medical needs, physical needs, equipment needs, guardianship needs and habilitation needs as a whole including all education, recreation, speech therapy, physical therapy, support services and other services required by the Decrees to meet the needs of the individual. They describe short and long term program goals and timetables for the attainment of those goals, and evaluate the individual's need for institutional care. Recommendation as to residential and program placement are based on evaluation of the actual needs of the resident or client rather than on what facilities and programs are currently available. *See* Dever Decree ¶ 6.

5. The defendants advertised for a position of Assistant Superintendent for Administration at the Dever State School, seeking an individual to assist with the "planned phase-down of the Dever State School" which was "expected to be completed over a three year period...." Boston Globe, Dec. 1, 1991.

eventual closing of Dever or any other Consent Decree facility. But, the court will not allow services to deteriorate at a facility while the state defendants go through the process of deciding what is going to happen to the residents. Rather, it is this court's expectation that a plan, founded upon the defendants' obligations, will be provided to assure that all class members will be protected throughout the process. Those obligations, specified in the Consent Decrees, the Personnel Decree, the Capital/Community Plan, Title XIX, and the court's memorandum and order of October 9, 1986 (Disengagement Order),[6] require the maintenance of adequate personnel levels at the state schools, the ongoing provision of services in accordance with class members' ISPs, and the utilization of evaluation and monitoring mechanisms.

## I.

The Personnel Decree, agreed to by the parties on July 10, 1978, provides that the defendants have a "continuing commitment under the terms of this Decree ... to comply with the personnel standards for care and treatment set forth in Title XIX of the Social Security Act, 42 U.S.C. § 1396a, and regulations promulgated thereunder." Personnel Decree ¶ 2. Specifically, ¶ 10 of the Personnel Decree recognized that, with decreasing resident population at the schools, staffing levels should be correspondingly adjusted. Before such changes could take place, however, the defendants agreed to obtain agreement of plaintiffs' counsel or, failing that, to bring any disagreement to the attention of the court for its resolution. *Id.* ¶ 10.

In 1986, to eliminate the need for continuing court intervention, this court adopted certain procedures, developed by the defendants under the supervision of HCFA. These procedures allow for adjustments in personnel levels at the schools to implement the defendants' planned reassignment of staff to housing agenda programs. The defendants created the "Single Standard Methodology" and various quality assurance and reporting procedures to ensure that services would be in place for class members upon their move to the community, and that services would be maintained at the state schools for those still residing there.

In the Disengagement Order, the court extended the use of the Single Standard Methodology to any situation in the future that would call for adjustment of staffing at the state schools resulting from community placement or increased resident need. The court expects the defendants to continue utilizing these procedures should they seek to reduce staffing levels at any of the schools.

## II.

In addition to maintaining staffing levels at the state schools, the defendants are obligated to substantially provide an array of services to each class member in accordance with his or her ISP. The Consent Decrees were fashioned by the parties to ensure the provision of those services wherever class members reside. For example, the Dever and Wrentham Decrees provide that "[t]he defendants will substantially provide or cause to be provided the services recommended in the individual service plan of each member for so long as such services are needed." Dever and Wrentham Decrees ¶ 14. In order to close Dever, or any other Consent Decree facility, the defendants must assure this court that they will meet each class member's needs, as specified in his or her ISP.

The Decrees permit significant changes in the life circumstances of class members, including the anticipated movement of a majority of class members from institutional environments to community homes. The Capital/Community Plan ("CCP"), an attachment to the Dever and Wrentham Decrees, specifically sets forth how the defendants are to comply with the requirements of the Dever and Wrentham Decrees for class members residing outside the Dever

---

**6.** The court issued the Disengagement Order to permit it to cease the active supervision of defendants' compliance with the Consent Decrees. The court ordered the Governor's Office to create the Office of Quality Assurance to oversee the provision of services to the class members.

and Wrentham State Schools. *See* CCP ¶ 1. The CCP includes commitments made by the defendants regarding the development and maintenance of a system of services as well as a set of procedures for planning and for monitoring those services. In recognition of the evolutionary nature of these events, the Decrees, the CCP and the subsequent rulings of this court have been fashioned in a flexible manner that guides the process as it unfolds, and provides safeguards for class members. Indeed, the CCP recognizes the need for the continual refinement of plans to accommodate unpredictable circumstances affecting the class, and makes explicit types of plans necessary when designing community services. *Id.* ¶¶ 16, 17.

The Governor's Consolidation Plan calls for the residential movement of hundreds of class members. It calls for the placement of over 800 residents from retardation facilities into a variety of community programs throughout the Commonwealth (most of these programs are not yet developed), and the subsequent closing and consolidation of certain state school facilities. It is, however, an over-simplification to assume that these will be the only residents affected. In order to effectuate consolidation, numerous residential transfers within each facility, as well as the transfer of several class members from one institution to another, may also be required.[7] Finally, the process is likely to result in the reassignment and reallocation of staff currently working at the facilities.

**7.** The court is aware that, at the time the parties entered into the Dever and Wrentham Decrees, they disagreed over "whether DMH can transfer residents to other state mental retardation institutions where that facility offers equivalent services and an equivalent environment...." Dever and Wrentham Decrees ¶ 46. The parties did agree, however, that before the defendants could recommend interinstitutional transfers, the defendants would comply with the placement procedures outlined in the Decrees, which gives the residents or their guardians an opportunity to object to the placement. *Id.* ¶¶ 42–44. In the event defendants propose the transfer of certain class members from one state school to another, such decisions will be made with reference to the same standards, regulations, and procedures governing community transfers.

**8.** Nothing in this order shall be construed as a restriction on defendants' ability to continue to

### III.

In the past, it has been this court's practice to ask the parties during time of great change to work together to ensure class members' best interests are well served. The court has requested that the defendants reaffirm and focus their obligations through adoption of a plan that informs the plaintiffs and court of the manner anticipated changes will be managed and to provide assurances that defendants' obligations will be actively addressed.[8] Given the far reaching nature of the Governor's Plan, and the number of class members who would be affected by its implementation, it is not unreasonable to call upon the defendants to provide the plaintiffs and the court with such a plan. The defendants plan should, at a minimum, be able to demonstrate their ability to maintain the following ongoing obligations to class members:

> Decisions regarding proposed services and residential placements must be made in accordance with the ISP process;[9]

> Service levels at the facilities must be maintained in accordance with Title XIX and Consent Decree standards;[10]

> Placements must occur into programs that substantially meet class members' ISPs and are consistent with the various standards established under the Consent Decrees, Title XIX, and the Capital/Community Plan;[11]

make community placements of individual class members as part of their continuing efforts to implement ISP recommendations.

**9.** *See* Dever and Wrentham Decrees ¶¶ 6–8; Fernald Decree ¶¶ 10–14.

**10.** Title XIX requires the creation of Individual Service Plans, 42 U.S.C. § 1396a(a)(31)(A), as well as active treatment in accordance with those plans, 42 U.S.C. § 1396d(d)(2). *See also* Disengagement Order ¶ 1 (requiring compliance with Title XIX requirements).

**11.** *See* Dever and Wrentham Decrees ¶ 34; CCP ¶¶ 9, 16–21. *See also* CCP ¶ 2 (prohibits reducing the current level of services to non-class members as a means of funding services to class members); CCP ¶ 13 (specifically identifies the role and responsibility of the service coordina-

Appropriate mechanisms must exist to provide class members and their families with due process rights regarding all ISP decisions, including transfer decisions into the community and to other institutions;[12]

Adequate advance notice of proposed transfers will continue to be provided to the plaintiffs and to the Office of Quality Assurance;[13] and

Necessary quality assurance/monitoring mechanism and reporting procedures will be in place to ensure the integrity of the planning process, the adequacy of placements, and the maintenance of services to class members remaining at the state schools.[14]

## IV.

The Consent Decrees do not prohibit the possible closing of any facility. Indeed, if residents are properly placed into alternative settings, and a facility is no longer needed, this court will not interfere with its closure.

But, this court does insist that services be properly maintained at all facilities throughout the transfer process, and that the alternative placements are made into appropriate settings. The critical HCFA report should be adequate notice to the defendants that, in their commendable effort to consolidate and save money, the quality of life at Dever has suffered.

tor). The CCP in its entirety provides standards for the appropriate placement of class members into community settings.

**12.** *See* CCP ¶¶ 6, 12, 41–46; Mass.Regs.Code tit. 104, §§ 20.03–20.14 (Standards to Promote Client Dignity), §§ 21.60–21.63 (Modification of ISP Special Transfer Requirements), §§ 21.85–21.90 (Client Appeals). *See also supra*, at 6 n. 6.

**13.** *See* Dever and Wrentham Decrees ¶ 44; Disengagement Order Appendix B.

**14.** *See* CCP ¶¶ 47–50; Disengagement Order ¶ 1, Appendix A and B; Dever and Wrentham Decrees ¶¶ 18, 44, 73.