**Robert Simpson RICCI, et al., Plaintiffs,**

v.

**Robert L. OKIN, M.D., et al., Defendants.**

**Civ. A. Nos. 72–0469–T, 74–2768–T, 75–3910–T, 75–5023–T and 75–5210–T.**

United States District Court,
D. Massachusetts.

May 25, 1993.

Nonnie S. Burnes, Hill & Barlow, Beryl W. Cohen, Boston, MA, for plaintiffs.

Kim E. Murdock, Gen. Counsel, Dept. of Mental Retardation, Douglas Wilkins, Asst. Atty. Gen., Boston, MA, David Ferleger, Philadelphia, PA, for defendants.

Suzanne Durrell, Asst. U.S. Atty., Boston, MA, for the U.S.

## MEMORANDUM

TAURO, Chief Judge.

Twenty-one years ago, I made my first trip to Belchertown, to see for myself the conditions alleged in a class action filed on behalf of the residents there.

To put that time frame in some perspective, I point out that the law clerk who accompanied me that day, Mark Brodin, is now a tenured professor at the Boston College Law School—a rookie Boston lawyer named Bill Weld had passed the bar less than two years earlier—and Kris Brown, the law clerk now working on these cases, was four years old.

Similar actions were later filed on behalf of the residents of Fernald, Monson, Dever and Wrentham.[*] I went to see them all, and the sights, sounds, smells and generally deplorable conditions I witnessed are as vivid in my mind today as they were those many years ago.

But, thanks to the healthy tenacity and persistence of the parents, friends and counsel of people with mental retardation—the enlightened leadership of responsible state and federal officials, and the oversight of the Office of Quality Assurance and predecessor Court Monitors—those initial inspection tours became the first steps in a process that has taken people with mental retardation from the snake pit, human warehouse environment of two decades ago, to the point where Massachusetts now has a system of care and habilitation that is probably second to none anywhere in the world.

For the past two decades, literally thousands of hours have been devoted to fashioning a comprehensive remedial program that has included multi-million dollar capital improvements, establishment of a responsible program of community placement, as well as significant staffing increases geared to meeting the individual service plans and overall needs of those with mental retardation.

The result is that, working together, we have created an environment for persons with mental retardation that is now characterized by human dignity and opportunity for growth. And we have done so in a way that consistently ensured a full measure of value for every tax dollar spent.

Despite this progress, these institutions and the related programs are, of course, not perfect. More needs to be done. And, most important, all concerned, both in the private and governmental sectors, need to be ever vigilant that we do not permit any erosion of the significant progress that has been made.

Given this progress, and the demonstrated good will and dedication of Governor Weld to the mission of safeguarding the health, safety and well-being of people with mental retardation, I am today signing a comprehensive Order closing the federal court's oversight of these cases.

A key factor in my decision to do so is Governor Weld's commitment to make permanent the historic improvements that have been achieved during the past twenty years—a commitment manifested and memorialized by the Executive Order he is issuing today, creating the Governor's Commission on Mental Retardation.

This Commission will be an independent citizen oversight body whose multi-faceted mandate and authority will include monitoring the quality and effectiveness of the Commonwealth's programs of services designed

---

[*] For a detailed exposition of the history of these cases, see *Ricci v. Okin,* 978 F.2d 764 (1st Cir. 1992); *Massachusetts Ass'n for Retarded Citizens v. King,* 668 F.2d 602 (1st Cir.1981); *Massachusetts Ass'n for Retarded Citizens v. King,* 643 F.2d 899 (1st Cir.1981); *Ricci v. Okin,* 781 F.Supp. 826 (D.Mass.1992); *Ricci v. Callahan,* 646 F.Supp. 378 (D.Mass.1986); *Ricci v. Callahan,* 576 F.Supp. 415 (D.Mass.1983); *Ricci v. Callahan,* 97 F.R.D. 737 (D.Mass.1983); *Ricci v. Okin,* 537 F.Supp. 817 (D.Mass.1982); Esther Scott, Judge Tauro and Care of the Retarded in Massachusetts (1987) (unpublished case program, Kennedy School of Government, Harvard University).

to address the wide variety of needs of people with mental retardation.

The nine members of the Commission will be selected by the Governor. Three of these members will be nominated by the existing Advisory Panel of the Office of Quality Assurance, thereby providing significant input from those who have been so intimately involved with these cases over the years.

The Commission will be served by a full-time Administrator appointed by the Governor. The Administrator will be a person who has demonstrated knowledge and experience with respect to quality assurance in the delivery of services to people with mental retardation.

The Commission will have access to all relevant information concerning people with mental retardation. It will serve as an ombudsman to resolve disputes, and it will provide a visible and credible forum to ensure that the Commonwealth fully complies with its obligations to its citizens with mental retardation.

The Commission will work cooperatively with the Department of Mental Retardation, and will serve as a source of valuable advice to the Commissioner and to the Governor with respect to issues affecting the quality of care for persons with mental retardation.

This independent citizen task force, having oversight responsibility for monitoring quality assurance, is the first of its type in the nation. And Governor Weld is to be commended for his foresight and sensitivity in creating this atmosphere of citizen inclusion with respect to the critical responsibility for monitoring the efforts of the Department of Mental Retardation.

I know that Governor Weld will choose the Commission members and the Administrator with great care. To his appointees I repeat something I said in 1982:

> The retarded have no potent political constituency. They must rely on the good will of those of us more fortunate than they, and the Constitution which controls the manner in which all of us must meet our varied responsibilities.

*Ricci v. Okin,* 537 F.Supp. 817, 836 (D.Mass. 1982).

My hope is that those words will serve as something of a standard for the Commission members and the Administrator as they assume this important public trust.

An Order will issue.

## ORDER

After notice and hearing, and with the consent of the parties, it is hereby ORDERED:

1. This Order supplants and replaces each of the consent decrees and all orders of the court in these matters. All such consent decrees and outstanding orders are hereby vacated and dissolved. These five consolidated cases shall be and hereby are closed and removed from the court's active docket. Any action to enforce the rights of the plaintiff classes may be brought before the court only pursuant to the terms of paragraph 7 below.

2. Defendants shall continue to provide services to the members of the plaintiff class as set forth in this paragraph.

a. Defendants shall substantially provide services to each class member on a lifetime basis. The specific services to be provided to each class member [1] to meet this obligation,

---

1. The plaintiff class will be defined as those individuals who have been identified in the Class Member Identification List issued as of April 30, 1993, regardless of their current place or residence, or any person who, on or after April 30, 1993, has resided at a state school during more than 30 consecutive days or for more than 60 days during any twelve-month period. Defendants shall maintain a mechanism for keeping track of the identities and locations of current class members, and the occurrence and history of transfers, which information shall be available to plaintiffs' counsel. During the first three years following issuance of this Order, defen-dants shall also transmit notices of the transfer of any class member to a designated representative from that individual's original class. Additionally, notice shall be sent to a representative of the Massachusetts Association of Retarded Citizens of the transfer of any class member from the original Dever and Wrentham classes.

As of this date, admissions to the state schools are closed; however nothing in this Order shall preclude defendants in the future from adopting a different admissions policy, or from modifying the current policy on admissions.

For purposes of this Order, "State School" shall include Belchertown, Dever, Fernald and

and defining this obligation, shall be set forth in an Individual Service Plan ("ISP") that details each class member's capabilities and needs for services, pursuant to the regulations governing the preparation of ISP's, as currently set forth in 104 CMR 20, et seq. (the "ISP Regulations").[2] Such services shall include, as appropriate for the person, residential programs; day programs; recreational and leisure time activities; medical, psychological, dental and health-related professional services; respite care and crisis intervention services; support and generic services, such as guardianship and adaptive equipment services; and transportation services.

b. Defendants shall not seek to amend, revise, or otherwise modify the ISP Regulations as they affect class members except upon 60 days written notice to plaintiffs' counsel, with an opportunity for plaintiffs to comment upon the proposed changes. Any amendments must leave in place a process that is at least the substantial equivalent of the regulations currently set forth in 104 CMR 20, et seq., with regard to the definition of the ISP, the individualized nature of the ISP, the existence of an appeal process, and the principles contained in footnotes 2 and 3 herein.

c. Sufficient adequately trained and experienced personnel, as reasonably determined by the Department of Mental Retardation based on professional judgment, shall be available to substantially meet the needs set forth in each class member's ISP.

d. Defendants shall maintain certification of state schools under federal Title XIX of the Social Security Act, 42 U.S.C. §§ 1396, et seq., and maintain compliance with the Department of Mental Retardation's Title XIX obligations with respect to services in the community, for as long as the state participates in those programs for each facility or service as to which the state receives Title XIX funds.

e. Within nine months of the date of this Order, defendants shall enter into an agreement with contracted consultant retardation professionals or with a nationally recognized evaluation group to review community programs on a periodic basis.

3. . a. Defendants shall continue to use the Single Standard Methodology for staffing state schools for five months, or until the implementation of an alternative staffing plan pursuant to the procedures set forth in subparagraph 3(b) below, whichever is later.

b. If the defendants wish to discontinue use of the Single Standard Methodology, defendants shall provide to the Governor's Commission on Mental Retardation for its review during at least one meeting an alternative staffing plan that will assure the presence of adequate numbers of appropriately trained staff at each state school sufficient to meet the needs of the individuals who continue to reside there. This alternative staffing plan shall be formulated by the Department of Mental Retardation based on its reasonable, professional judgment and may or may not utilize specific ratios for staff.

4. Defendants shall not approve a transfer of any class member out of a state school into the community, or from one community residence to another such residence, until and unless the Superintendent of the transferring school (or the Regional Director of the pertinent community region) certifies that the individual to be transferred will receive equal or better services to meet their needs in the new location, and that all ISP-recommended services for the individual's current needs as identified in the ISP are available at the new location.

5. Except as set forth in other paragraphs of this Order, nothing in this Order is intended to detract from or limit the discretion of the defendants in developing and improving programs, managing and determining the personnel and budget of the Department of Mental Retardation and other state agencies, implementing innovative services, improving quality enhancement and dispute-resolution mechanisms, or allocating its resources to ensure equitable treatment of its citizens.

---

Wrentham State Schools and Monson Developmental Center.

**2.** These regulations shall guarantee that each class member be provided with the least restrictive, most normal, appropriate residential environment, together with the most appropriate treatment, training, and support services suited to that person's individual needs.

6. Defendants shall continue to seek to improve, and shall not undermine, the progress achieved during the period of this litigation by:

a. Maintaining and implementing the basic principles of the ISP.[3]

b. Exerting their best efforts to maintain and secure sufficient funds to meet the needs of class members under this Order. The defendants shall be determined to have met their obligation under this subparagraph if the defendants have secured and maintained an annual appropriation for the Department of Mental Retardation at least equal to the total gross amount of the actual appropriations for Fiscal Year 1993.[4]

7. a. If the defendants substantially fail to provide a state ISP process in compliance with this Order, or if there is a systemic failure to provide services to class members as described in this Order, the plaintiffs may seek enforcement of the Order pursuant to this paragraph. Individual ISP disputes shall be enforced solely through the state ISP process.

b. Nothing in this Order shall make state law (including but not limited to the ISP regulations) enforceable in federal court, but claims of a failure to provide an ISP process in compliance with this Order or claims of systemic failure to provide ISP services required by this Order may be enforced in this court, even if such claims also state a violation of state law.

c. Should the plaintiff class believe that the defendants are not in substantial compliance with this Order with regard to systemic issues, plaintiffs may seek to reopen this case and to restore this case to the active docket and to move for enforcement of this Order only after the following steps have occurred:[5] (1) plaintiffs have given written notice to defendants of the alleged non-compliance, including the facts alleged and the provision of the Order involved; (2) defendants have been provided with 30 days to review and respond to plaintiffs' notice, and to inform plaintiffs of any proposed plan of correction; (3) plaintiffs and defendants (or their respective counsel) have met personally at least twice to discuss and seek to resolve any remaining dispute under the notice. The court shall have jurisdiction to enforce the provisions of this Order pursuant to this paragraph, which shall be the exclusive means of enforcing this Order.

d. The matters which may be raised under subparagraph. 7(a) above are assertions of future systemic violations of this Order. Nothing in this paragraph 7 shall be construed to prevent a class member from bringing an independent action in the event that the individual's grievances have not been remedied through existing state procedures.

e. Plaintiffs may not seek to reopen this case based solely on facts known by them as of the date of this Order. Plaintiffs may, however, use existing facts in connection with any assertions of future systemic violations of this Order.

8. This Order shall take effect upon written notification to the court by the Governor that he has issued the Executive Order set forth in Appendix A, which is attached hereto and incorporated herein, and that all mem-

---

3. These principles, currently in Department of Mental Retardation regulations, are "(1) human dignity, (2) humane and adequate care and treatment, (3) self-determination and freedom of choice to the person's fullest capacity, (4) the opportunity to live and receive services in the least restrictive and most normal setting possible, (5) the opportunity to undergo normal developmental experiences, even though such experiences may entail an element of risk, provided however that the person's safety and well-being shall not be unreasonably jeopardized, and (6) the opportunity to engage in activities and styles of living which encourage and maintain the integration of the client in the community through individualized social and physical environments."

4. This amount shall be set as follows: Within 14 days of the final appropriation for the Department of Mental Retardation for Fiscal Year 1993, the defendants shall file with the court a certification of the total gross amount of actual appropriations for the Department of Mental Retardation for Fiscal Year 1993 which shall constitute an appendix to this Order and shall be incorporated herein by reference.

5. The procedures required by this subparagraph will apply except in a situation where serious irreparable harm would result if all the requirements were met; in such a situation, plaintiffs shall give the maximum practical notice and the parties shall comply with all the requirements to the extent possible, given the urgency of the situation.

bers of the Governor's Commission on Mental Retardation have been sworn and the Administrator has been appointed.[6] The Advisory Panel of the Office of Quality Assurance shall submit its list of Commission member nominees to the Governor within 30 days of the signing of this Order.

9. Defendants shall place the following information describing the rights and services under this Order in the permanent record of each class member, shall retain such information on record for so long as the class member is alive, and shall seek to enter such information in the class member's file maintained by all providers of services to class members (and, within one year, by contract require such entry by providers):

a. designation of class membership;

b. notation that class membership results in rights and services guaranteed by this Order, and a summary of those rights; and

c. the name, address and telephone number of plaintiffs' counsel, various advocacy organizations, the Department of Mental Retardation, and the Governor's Commission.

The above information shall be reviewed with each class member at that individual's next scheduled ISP meeting following the effective date of this Order.

IT IS SO ORDERED.

### APPENDIX A

THE COMMONWEALTH OF MASSACHUSETTS

EXECUTIVE DEPARTMENT

STATE HOUSE     BOSTON 02133

(617) 727–3600

BY HIS EXCELLENCY

WILLIAM F. WELD

GOVERNOR

EXECUTIVE ORDER NO. 356

*GOVERNOR'S COMMISSION ON MENTAL RETARDATION*

WHEREAS, it is the responsibility of the Commonwealth to safeguard the health, safe-ty and well-being of its citizens with mental retardation; and

WHEREAS, it is the responsibility of the Commonwealth to ensure that the system of services for people with mental retardation never regresses to the deplorable and degrading conditions of the past; and

WHEREAS, the Commonwealth desires to make permanent the historic improvements in the care of people with mental retardation that were brought about by those who found the conditions of the past utterly unacceptable; and

WHEREAS, the Commonwealth recognizes the value inherent in its receiving ideas and maintaining communication with family members, advocates, public officials, and other members of the public interested in enhancing the well-being of people with mental retardation; and

WHEREAS, it is important that people with mental retardation, their families and the public, be provided with a forum for discussion and resolution of disputes that may otherwise not be addressed by the Department of Mental Retardation pursuant to its statutory responsibilities; and

WHEREAS, it is the responsibility of the Commonwealth to educate the general public as to the potential of people with mental retardation to make meaningful contributions to the communities in which they reside; and

WHEREAS, people with mental retardation must have opportunities to make choices with respect to their future, and to influence the course of public policy as it affects such choices; and

WHEREAS, presence and participation in community life are valued aspirations for people with mental retardation, as they are for all citizens of the Commonwealth; and

WHEREAS, the Commonwealth's network of individualized services designed to address

---

6. Once this Order takes effect, the Office of Quality Assurance shall limit its activities to those necessary to transfer its files to the Governor's Commission. It is understood that the Office shall cease all operations upon the appointment of the Administrator of the Commission, or on June 30, 1993, whichever event later occurs.

the wide variety of needs of people with mental retardation must be continually evaluated and monitored to ensure its quality and effectiveness;

NOW, THEREFORE, I, William F. Weld, Governor of the Commonwealth, by virtue of the authority vested in me as Supreme Executive Magistrate, do hereby establish the Governor's Commission on Mental Retardation, as follows:

### ARTICLE I. *Purpose and Scope of Commission*

1.1 The purpose of the Commission shall be:

(a) to monitor the quality and effectiveness of the Commonwealth's program of services designed to address the wide variety of needs of people with mental retardation;

(b) to discuss and resolve, to the extent practicable, individual and systemic disputes raised by individuals with mental retardation, their families or guardians, for which no other forum exists, or which have not been adequately resolved by existing avenues of redress;

(c) to provide a visible and credible forum for the review of public policy as it affects persons with mental retardation, and to ensure that the Commonwealth fully complies with its obligations to meet their special needs;

(d) to inform the public, as well as those at the highest levels of state government, whenever the Commonwealth has failed in its obligations to its citizens with mental retardation;

(e) to work cooperatively with the Department of Mental Retardation in an effort to support the Department's mission to serve people with mental retardation, and to act as an advocate for the Department, with the public and those within state government, for the purpose of ensuring the quality and effectiveness of Department programs designed to achieve its mission; and

(f) to support and review implementation of the recommendations of the Commission made pursuant to its responsibilities under 1.1(b) above, after discussion with and receipt of information from the Commissioner of Mental Retardation and other concerned individuals and organizations.

### ARTICLE II. *Membership and Structure of Commission*

2.1 The Commission shall consist of nine (9) members appointed by the Governor. Members will be appointed for a term of three (3) years.

2.2 At least three members shall be appointed from a list of not less than twelve (12) nominees submitted to the Governor by the Advisory Panel of the Office of Quality Assurance.

2.3 The Governor shall appoint a Chair of the Commission from among its members.

2.4 Members of the Commission shall consist of persons with demonstrated interest, experience, and expertise in mental retardation. No employee of the Department of Mental Retardation, or its contractors, may be a member of the Commission. Members shall be considered to be special state employees and subject to the provisions of General Laws ch. 268A.

2.5 Members of the Commission shall serve without compensation, but shall be reimbursed for necessary expenses incurred in the performance of their duties.

2.6 Members of the Commission may be removed by the Governor for good cause shown, including but not limited to failure to attend Commission meetings, as evidenced by absence from three or more Commission meetings in any one calendar year. Voting by proxy or absentee ballot shall not be permitted at Commission meetings, or otherwise in the work of the Commission.

2.7 Vacancies in the membership of the Commission shall be filled promptly by the Governor. Whenever a vacancy occurs in any of the three positions originally appointed from the list submitted by the Advisory Panel of the Office of Quality Assurance, the Governor shall appoint a successor from a list of four (4) candidates submitted by a nominating committee established for the express purpose of filling

such vacancies. This nominating committee shall consist of six (6) members and shall be constituted as follows: one representative from each of the four state school parents associations (Dever, Fernald, Monson, Wrentham), one representative from Advocacy Network, Inc., and one representative from the Massachusetts Association for Retarded Citizens.

2.8 There shall be a full-time Administrator of the Commission who shall be selected by the Governor. The Administrator shall be an employee of the Commonwealth, and shall be compensated for the performance of his or her duties. The Administrator shall have full knowledge of the mental retardation service system and agencies delivering such service and have demonstrated experience in administration and quality assurance. The Administrator shall hold no other public office.

## ARTICLE III. *Powers and Duties of Commission Generally*

3.1 The Commission shall adopt such internal procedures as are appropriate for the effective performance of its duties. Decisions of the Commission shall be by majority vote of those present, with a quorum of seven members present required for such decisions. Any procedural issues that may arise during Commission meetings shall be resolved by reference to Robert's Rules of Order.

3.2 The Commission shall hold public hearings, in Boston and at such other locations as it shall determine, from time to time, but in no event less than semi-annually. The subject of such hearings shall include, but shall not be limited to: the quality of the health, safety and well-being of the Commonwealth's citizens with mental retardation; the quality of publicly-funded services available to such citizens; and the extent to which the private sector and the community at large provide opportunities for persons with mental retardation. The results of such hearings shall be reported to the Commissioner of the Department of Mental Retardation, the Secretary of the Executive Office of Health and Human Services, and the Governor.

3.3 The Commission, the Administrator, or any person they may designate, shall have access at any and all reasonable times to any retardation facility, residence, program, or part thereof, and to all relevant records, reports, materials, and employees, in order to allow them to enhance their appreciation of the needs of persons with mental retardation, and to monitor the quality with which such needs are being met.

3.4 The Commission may make recommendations to the Governor as to how the quality of life of citizens with mental retardation may be improved by legislation and/or regulations.

3.5 The Commission, and/or the Administrator, may, from time to time, issue reports on matters affecting the health, safety and well-being of persons with mental retardation, including reports on the results of activities conducted in accordance with 3.3 above, and may make recommendations for corrective action in response to findings concerning those activities, as well as to complaints that have been reviewed in accordance with Article IV, below. The agencies to which these reports and/or recommendations are directed shall respond to the Commission within a reasonable time frame.

## ARTICLE IV. *Commission's Powers to Serve as Ombudsman and to Resolve Disputes*

4.1 (a) The Administrator, acting on behalf of the Commission, shall be empowered to receive complaints concerning the provision of services to persons with mental retardation that have not been resolved, within a reasonable time, at the local level, or at the level of the Department of Mental Retardation. Prior to presenting a matter for review by the Commission, the Administrator shall consider whether the complaint can be resolved through conciliation. If so, the Administrator shall implement conciliation discussions. In every case, the Administrator shall ensure that the De-

partment of Mental Retardation has had a full opportunity to resolve the matter prior to presentation of the matter to the Commission.

(b) The Commission shall not, in the first instance, consider complaints concerning matters that should be addressed pursuant to: (i) statute or regulations concerning Individual Service Plans; (ii) regulations requiring complaint investigation by the Department; (iii) statutes or regulations governing abuse or neglect of persons with mental retardation; or (iv) any matter for which there exists another mechanism instituted by law for the purpose of addressing the complaint. The Administrator, however, may monitor the processing of such complaints to determine whether the complainant has made full use of existing procedures, and if not, fully inform complainant of such procedures. If the matter has not been resolved pursuant to the procedures described in (i) through (iv) above, or the Administrator's conciliation effort has not resolved the matter, then the Administrator may refer the complaint to the Commission for its review.

(c) The Commission shall not consider complaints from employees of the Department of Mental Retardation when the matter complained of is the proper subject of union grievance proceedings, civil service laws, or other processes designed to deal with conditions of employment.

4.2 In responding to a complaint, or in the performance of their duties as outlined in the preceding Articles, the Commission, its Administrator, or their designee may request and obtain such information from agencies of the Commonwealth as is necessary to perform their duties, unless otherwise prohibited by law,[1] including:

(a) information, data, and reports generated by the existing quality assurance mechanism of the Department of Mental Retardation;

(b) information, data, and reports generated by the Health Care Financing Administration or other federal or state agencies pursuant to Title XIX or other federal statutes or regulations; and

(c) information, data, and reports generated as a result of investigations conducted by the Department of Mental Retardation, the Department of Public Health, the Disabled Persons Protection Commission, the Inspector General's Office, or any other state agency.

4.3 The Commission, its Administrator, or their designee may also:

(a) visit, inspect, and make firsthand appraisals of mental retardation facilities, residences, and programs, with specific attention to the safety, security, and quality of care provided;

(b) evaluate information and reports from consumers, their families or representatives, or others, regarding the effectiveness and adequacy of services and quality assurance mechanisms; and

(c) monitor facilities, residences, and programs for the purpose of determining whether problems that have been the subject of past complaints have been rectified.

4.4 The Commission and its designees shall be bound by any limitations on the use or release of information imposed by law upon the party furnishing such information to the Commission and its designees.

4.5 The Commission shall be empowered to mediate and to recommend resolution of disputes between the Department of Mental Retardation and those it serves. In such cases, the Commission may act only after it has, by majority vote, directed the Administrator to bring the matter to the attention of the Commissioner of the Department of Mental Retardation for a response, and has determined that no adequate remedy has been forthcoming to address the matter in dispute.

4.6 If the Department of Mental Retardation fails to implement a mediated agreement or recommended resolution reached

1. The Department of Mental Retardation has determined that disclosure to the Commission of otherwise confidential information about its con-

sumers shall be in the consumers' best interest and therefore shall not be prohibited by law.

pursuant to 4.1 above, after notice to the Commissioner who shall be provided with an opportunity to respond, the Commission is authorized to make recommendations directly to the Governor concerning the matter at issue. Such recommendations to the Governor shall be public information.

4.7 The Administrator shall coordinate the mediation and dispute resolution functions of the Commission. Twice annually, the Administrator shall issue an analysis of cases brought to the Commission's attention. Such analysis shall be provided by the Commission to the Governor, the Secretary of the Executive Office of Health and Human Services, and to the Commissioner of the Department of Mental Retardation. This analysis shall be public information.

## ARTICLE V. *Miscellaneous*

5.1 To maximize its capability of realizing its mission, the Commission shall be located in the office of the Governor, and shall report directly to the Governor.

5.2 The Commission and the Administrator shall be provided with staff, secretarial support and other resources necessary to meet their responsibilities. A first Annual Budget for these purposes is attached as an appendix.

5.3 The quality assurance processes of the Department of Mental Retardation and the Commission shall work collaboratively for the benefit of people with mental retardation.

5.4 The Commission, including the Administrator and its staff, shall exist for three years commencing from the date all members and the Administrator are fully sworn. Six months prior to the end of this three year term, the Commission, in consultation with the Administrator, shall make a recommendation to the Governor as to whether the continued existence of the Commission is advisable to assure quality of services and protection of rights for people with mental retardation.

Given at the Executive Chamber in Boston this 25 day of May in the year of our Lord one thousand nine hundred and ninety-three.

/s/ William F. Weld

William F. Weld, Governor

Commonwealth of Massachusetts

/s/ Michael Joseph Connolly

Michael Joseph Connolly

Secretary of the Commonwealth

## GOD SAVE THE COMMONWEALTH OF MASSACHUSETTS

### EXHIBIT A

#### First Year Budget

This document describes the total first year budget that will be requested for the Commission on Mental Retardation, the staffing and other expenses which it would cover, and the principles which will guide the implementation of the budget.

**Amount of Budget.** The first year budget for the Commission on Mental Retardation will be $200,000. To the extent this amount is insufficient to fully fund the non-personnel requirements of the Commission, the Executive Office of Health and Human Services, the Department of Mental Retardation, and other appropriate state agencies shall provide additional funds or support as are needed to allow for travel, equipment (including computer equipment and programs), supplies, telephones, and photocopying. Any such additional support shall be provided in accordance with applicable state laws and procedures.

**Adjustments to Budget.** It is recognized that the needs of the Commission may change, based on its experience in the first year. For the second and subsequent years, the amount to be requested from the Legislature will be re-evaluated and adjusted as necessary, taking into consideration any recommendations of the Commission, the actual and anticipated workload of the staff, and to assure the accomplishment of the Commission's purposes. Any comments or suggestions from the Plaintiffs' counsel will be considered as well.

**Staffing.** The professional staff of the Commission will consist of from two to four professional staff, plus support staff. Professionals must have knowledge of the mental retardation service system and related agencies, and demonstrated experience in the field of mental retardation. Also, it is expected that graduate and undergraduate students in intern and extern programs will be attracted through formal arrangements with institutions of higher learning to assist the professional staff. The first year would begin with at least two professional staff (the Administrator and an Assistant Administrator are anticipated), both full-time, with a full-time secretary. The number and nature of the staff will depend on the qualifications, and salary needs, of the persons hired, considered together with the non-personnel needs of the Commission. Benefits would be approximately 28% of the total salary amounts.

**Transition.** Orientation and transition briefings and assistance will be provided to the professional staff, and to the Commission, by the Department of Mental Retardation and, it is expected, by the Office of Quality Assurance. No cost would be incurred for this transitional assistance.

**Commission Member Expenses.** The minimum cost expected for Commission members for reimbursement of expenses is $5,832. This would include $120 per member for parking ($10/member × 12 potential monthly meetings): $528 per member for travel (200 miles @ $.22/mile × 12 meetings). Total: $648 per member × 9 members = $5,832.

**Other Costs.** *Staff travel* is expected to be in the range of $1,960 (assuming 9,000 miles at $.22 per mile). *Office space* will be sought in an existing state-owned building so that space costs may be avoided. *Equipment and supplies* are expected to be in the range of $6,300. Computer equipment and appropriate computer programs will be provided. Additional costs would be incurred for telephone and photocopy, as well as for transcription for any hearings or formal proceedings: these costs would likely total in the $7,000 to $10,000 range. Costs for *consultants* to the Commission would be charged to the Commission budget or, when appropriate and agreed to, might be shared with DMR or other state agencies.

**Cooperation With Other State Agencies.** As the Executive Order states, Par. 1.1(e), the Commission is expected to "work cooperatively with the Department of Mental Retardation ... in support of the Department's mission ... and act as an advocate for the Department, with the public and those within state government ...". To that end, it is expected that the Governor's Office, EOHHS, DMR and other agencies will join with the Commission to assist it to maximize the effectiveness of its work and its budget.